## UNITED STATES DISTRICT COURT     SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| PROVIDENT LIFE & ACCIDENT INSURANCE COMPANY, | § § § | |
| Plaintiff, | § § | |
| *versus* | § § § | CIVIL ACTION H-95-5486 |
| STANISLAW R. BURZYNSKI, M.D., and BURZYNSKI RESEARCH INSTITUTE, INC., | § § § § | |
| Defendants. | § | |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
ENTERED

AUG 07 1998

Michael N. Milby, Clerk

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

I.     The Court's Findings and Analysis

    A.     Findings of Fact

      1.     Plaintiff Provident Life & Accident Insurance Company ("Provident") instituted this action on December 5, 1995, asserting claims against Stanislaw R. Burzynski ("Burzynski") and the Burzynski Research Institute ("BRI") for reimbursement under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, and under Texas law for civil fraud, negligent misrepresentation, and unjust enrichment. In addition, Provident seeks a declaratory judgment, prejudgment and postjudgment interest, exemplary damages, and attorneys' fees. Burzynski counterclaimed seeking reimbursement for treatment provided to one of his patients.

      2.     Provident alleges that it improperly paid Defendants for the treatment of six patients who were insured by medical plans which it underwrote or administered.

      3.     The parties consented to a trial before this court, which began on October 15, 1997, and concluded on October 27, 1997.

68

4.      Provident is a group medical and life insurer and individual health, accident, and disability insurer licensed under the laws of Tennessee, with its principal office in Chattanooga, Tennessee.  It also has branch offices in several other states.

5.      Each branch office has considerable autonomy, as each has its own claims processing department and nursing staff.  All offices, however, are connected to a central computer system.

6.      All requests for payments are sent by the branch offices to the main computer center in Chattanooga, which processes the claims and distributes payment checks to providers and insureds.  The principal office in Chattanooga also issues Explanation of Benefits ("EOB") forms, which explain the payment, partial payment, or denial of benefits.

7.      The Chattanooga office generally has access to all information contained in the branch offices, but the branch offices have limited access to information contained in other branch offices.

8.      Burzynski is a physician licensed to practice medicine in the State of Texas, who offices in Houston, Texas.  Burzynski's practice consists almost exclusively of treating cancer patients with a drug he developed known as "antineoplastons."

9.      BRI, a Delaware corporation, was established in 1977 and became a publicly held corporation in 1983.  BRI maintains offices at Burzynski's clinic and has research and production facilities in Stafford, Texas.

10.     Burzynski is BRI's president and chairman of its board of directors.  The other members of the board include Burzynski's wife, his brother, Dr. Carlton Hayzuld of the Baylor College of Medicine, and former Harris County Attorney Michael Driscoll.

2

CHJPDF - www.fastio.com

11.     Burzynski owns about eighty percent of BRI's stock.  The other twenty percent is owned by about 2,000 shareholders.

12.     Burzynski testified that his wife, children, and brother own a relatively small percentage, "probably less than 1/10 of a percent."  The second single largest shareholder of BRI is a group of investors from the West Coast.

13.     During the relevant time period, Burzynski's clinic employed a staff of approximately fifty to seventy employees and treated approximately 200 patients at any give time.

14.     Four of Burzynski's employees also worked for BRI:    Barbara Tomaszewski, Chris Visnesky, Kinga Szopa, and another unnamed employee.

15.     BRI and Burzynski had the same accountant and shared four employees.  There was no evidence that BRI and Burzynski shared common business departments.  Further, the evidence indicates that Burzynski's clinic continues to keep the businesses separate by not allowing BRI to receive any money from services relating to patients.

16.     There is no evidence that consolidated financial statements were prepared or that consolidated tax returns were filed.

17.     Moreover, there is no evidence that BRI operated with grossly inadequate capital.

18.     Burzynski testified that the clinic sometimes uses equipment that belongs to BRI.  He added that the clinic pays rental fees to BRI for the use of the equipment.

CMPDF - www.fatso.com

19.     Prior to 1992, BRI produced the antineoplastons and prepared them for patient use.  From 1992 on, BRI merely furnished the antineoplastons to Burzynski's clinic, which prepared them for use by his patients.

20.     BRI was not involved in the treatment of patients.  Formerly, the billing was done jointly, but BRI currently does not bill insurance companies.

21.     Almost all of BRI's funding comes from Burzynski.  Specifically, Burzynski provided financing for BRI between 1991 and 1995.  Burzynski testified that his clinic was also "paying 60 percent of the salaries of the employees of" BRI and was "paying royalties in the amount of 17 percent of gross income of the clinic."

22.     Between 1991 and 1995, the time period at issue here, the drug antineoplastons was not approved for use by the United States Food and Drug Administration ("FDA").

23.     Burzynski treated the following patients at issue in this action with antineoplastons:   Joy McKeeby ("McKeeby"); Helen Medow ("Medow"); Patrick Hadley ("Hadley"); Mary Gallagher ("Gallagher"); Thomas Harvey ("Harvey"); and Joyce Carroll ("Carroll").  The patients were also treated with other prescription medications and therapeutic agents.

24.     None of these patients was enrolled in a clinical trial for antineoplastons during the time period for which Provident seeks recovery from Burzynski.

25.     Burzynski sought compensation for treating these patients by submitting claim forms to Provident.  The forms are approved by the Health Care Financing Administration

4

and are referred to as "HCFA 1500s." These forms or variations of the forms are used by almost all health care providers to bill insurance companies for medical services and treatment.

26.     Insurers and providers use standardized numeric codes on the HCFA 1500s to designate the drug or therapy that was administered. The standard codes used in the industry are supplied by the American Medical Association ("AMA") in its Current Procedural Terminology ("CPT") book.

27.     The CPT book is a listing of descriptive terms and identifying codes for reporting medical services and procedures performed by physicians. The current edition of the CPT identifies more than six thousand medical procedures and provides a five-digit code and brief description of each. A listing of the AMA CPT Editorial Panel and the extensive AMA CPT Advisory Committee is contained in the front of each year's edition of the CPT. The purpose of the terminology is to provide a uniform language that will accurately describe medical, surgical, and diagnostic services in order to provide an effective means for reliable nationwide communication among physicians, patients, and third-parties.

28.     This CPT system of terminology is the most widely accepted nomenclature for the reporting of medical procedures and services under government and private health insurance programs. The CPT is also useful for administrative management purposes, such as claims processing, and for the development of guidelines for medical care review. The uniform language is likewise helpful for medical education and research by providing a standardized basis for local, regional, and national utilization comparisons.

29.     The CPT Codes are divided into six major categories: (1) Evaluation and Management; (2) Anesthesia; (3) Surgery; (4) Radiology, Nuclear Medicine, and Diagnostic

CM/PDF - www.fastio.com

Ultrasound; (5) Pathology and Laboratory; and (6) Medicine. Each procedure or service is identified with a five-digit code. Most procedures are represented by an individual code, but some codes represent several procedures.

30.     The use of CPT Codes simplifies the reporting of services. Through the use of this coding and recording system, the procedure or service rendered by the physician should be accurately identified. Inclusion of a descriptor and its associated, specific five-digit identifying code number is generally based upon the procedure being performed, consistent with contemporary medical practice in multiple locations.

31.     A physician using CPT terminology and coding selects the name of the procedure or service that most accurately identifies the service performed. When necessary, the physician lists any modifying or extenuating circumstances. Any service or procedure should be adequately documented in the medical record.

32.     Specific "Guidelines" are presented at the beginning of each of the six sections. These Guidelines define items that are necessary to interpret and report the procedures and services contained in that section in an appropriate manner. For example, in the Medicine section, specific instructions are provided for handling unlisted services or procedures, special reports, and supplies and materials provided by the physician.

33.     Further, it is recognized that there may be services or procedures performed by physicians that are not found in the CPT. Therefore, a number of specific code numbers have been designated for reporting unlisted procedures. When an unlisted procedure number is used, the service or procedure should be described. Each of these unlisted procedural code numbers (with the appropriate accompanying topical entry) relates to a specific section of

6

the book and is presented in the Guidelines of that section. A novel or unusual service may require a special report in determining medical appropriateness of the service.

34.     Evaluation and Management Services ("E/M") are divided into broad categories such as office visits, hospital visits, and consultations.

35.     The Medicine section of the CPT provides code numbers for diagnostic and therapeutic procedures performed by physicians either in their offices or at a hospital or clinic. Chemotherapy Administration procedures are listed as CPT Codes 96400 - 96549. The CPT Code most frequently used by Burzynski on the HCFA 1500 claim forms was 96414: "chemotherapy administration, infusion technique, initiation of prolonged infusion (more than eight hours), requiring the use of a portable or implantable pump." When a patient was treated with antineoplastons capsules, Burzynski usually listed CPT Code 96545:  provision of chemotherapy agent. The HCFA 1500 forms submitted to Provident never utilized CPT Code 96549, which denotes an unlisted chemotherapy procedure.

36.     Under the E/M Codes, in addition to the codes for office visits, there are CPT Codes for case management services including CPT 99371:  telephone call by a physician to patient; CPT 99372:  intermediate telephone call; and 99373:  complex or lengthy telephone call by a physician to patient. None of the HCFA 1500 claim forms submitted by Burzynski to Provident utilized the CPT Codes for telephone calls, even though, on most occasions, this was the actual "service" or contact with the patient.

37.     In Block 24D of the HCFA 1500, which is headed "Procedures, Services, or Supplies" and has columns sub-headed "CPT-HCPCS" and "Modifier," there is also a printed instruction:  "(Explain Unusual Circumstances)."

7

CHIPDF - www.fasoo.com

38.     Wanda McArthur ("McArthur"), Provident's medical technology supervisor, testified that this column is the space in which a physician should explain that he is administering an experimental or investigative drug and providing treatment in an other-than-usual manner, or not strictly as defined by the CPT Manual.  McArthur provided samples of HCFA 1500s submitted by other physicians providing such explanations or descriptions.

39.     Other than use of the abbreviation "ANP" on some of the forms, the HCFA 1500s submitted by Burzynski did not contain any indication of the drug that was being administered.

40.     Gabrielle Howard ("Howard")—an employee in Burzynski's insurance department—testified that insurance companies prefer not receiving attachments to claim forms, as it impedes the processing of the claims.

41.     In a letter to Howard, Grace M. Kotowicz—a Research Associate with the AMA's CPT Clearinghouse—states that

CPT does not designate the specific antineoplastic agents [sic] are administered by virtue of reporting the Chemotherapy Administration series of CPT codes 96400-96549.  However, each third party payor administrates according to the policy directives outlined in their reimbursement guidelines regarding drugs under clinical trials.

This letter was admitted as Defendants' Exhibit 15.

42.     McKeeby lives in Arleta, California, and participates in the Los Angeles County Employees Retirement Association Group Medical Plan administered by Provident.  The parties agree that this plan is not governed by ERISA.

43.     Prior to participating in the Los Angeles County Plan, McKeeby was insured by one of the Blue Cross companies.

44. McKeeby also had catastrophic insurance coverage with Washington National.

45. In 1981, McKeeby was diagnosed with lymphoma of the right lung. Initially, she had surgery, which did not remove all of the malignancy. She refused chemotherapy and instead tried "immunotherapy."

46. Initially, Blue Cross and Washington National paid for her immunotherapy treatments. After Washington National learned of its unconventional nature, however, it ceased paying for the treatment and informed Blue Cross of its actions. Subsequently, Blue Cross also ceased paying for the treatment.

47. McKeeby started treatment with Burzynski in late 1991. She received antineoplastons in capsule form, as well as Interferon. She ceased treatment in April 1993, but restarted treatment in October 1994, using an intravenous form of antineoplastons. McKeeby ceased and restarted treatment several times and is currently participating in a clinical trial of antineoplastons under Burzynski's supervision.

48. McKeeby testified that although she is not cured, the drug improves her condition, which deteriorates when she stops taking it. McKeeby was enrolled in an FDA approved clinical trial in late August 1996.

49. During the time McKeeby was undergoing capsule therapy, the clinic billed daily charges on the HCFA 1500 forms under CPT Codes 96549, 96414, 99215, and 99358.

50. Copies of some of the claim forms submitted by Burzynski to Provident for McKeeby's treatment were admitted into evidence as Plaintiff's Exhibit 45. A summary of

9

the CPT Codes used by Burzynski on McKeeby's claim forms was admitted into evidence as Plaintiff's Exhibit 38.

51.     McKeeby's insurance claim forms were processed by Provident's Regional Claims Office in Memphis, Tennessee.

52.     A copy of McKeeby's Group Insurance Plan was admitted into evidence as Plaintiff's Exhibit 36.  On page six, the plan states:

> **Covered Expense** means expense incurred while insured, for the following necessary services and supplies authorized by a doctor:
> *     *     *
> —Doctor's professional medical and surgical services . . . .

On page eleven of the plan, the term "expense incurred" is defined.

> **"Expense Incurred"** means only fees and prices regularly and customarily charged for medical services and supplies generally furnished for cases of comparable nature and severity in the particular geographical area concerned.

53.     Provident paid for Burzynski's treatment of McKeeby until 1995. Provident  stopped further payment for the treatment when it learned, during its investigation of Gallagher's claims in 1994-95, that the treatment was experimental and not approved by the FDA.   Even after this suit was filed, however, and after denying payment for McKeeby's treatment, Provident issued at least one additional check to Burzynski on McKeeby's behalf.

54.     In her testimony, McKeeby indicated that she did not submit a claim to Washington National for Burzynski's treatment, as she feared that it would inform Provident of the unconventional nature of the treatment and that Provident would cease paying for the antineoplastons.

10

55. The testimony of Cathy Smith ("Smith")—Provident's Claims Supervisor—indicates that Provident paid Burzynski $158,808.40 for the treatment of McKeeby, and $1,065.00 to another party for Magnetic Resonance Imaging ordered by Burzynski.

56. Burzynski asserts that there is a current balance due of $76,925.00 for McKeeby's treatment.

57. Provident continues to administer McKeeby's health insurance, and the insurance contract admitted into evidence is still in effect.

58. Medow, formerly a registered nurse, lived in Miami, Florida, and participated in the AMA Group Medical Plan, which was issued and underwritten by Provident. Medow's husband was a practicing physician. The parties agree that Medow's plan is not governed by ERISA.

59. In June 1987, Medow was diagnosed with breast cancer. Prior to her treatment by Burzynski, she underwent a modified radical mastectomy followed by chemotherapy for six months. She also took Tamoxifen and intermittently underwent hormonal and radiation therapy.

60. With terminal, stage IV breast cancer and enlarged lymph nodes, Medow began treatment with Burzynski on February 12, 1992. Despite some tumor shrinkage, Medow died on March 22, 1992.

61. Burzynski treated Medow with antineoplastons capsules and Methorexate.

62. In billing Provident for the administration of antineoplastons, Burzynski submitted HCFA 1500 claim forms principally using CPT Code 96549, but also utilizing CPT Codes 99205, 96549, and 99215.

CHIPDF - www.fastio.com

63. Copies of the claim forms submitted to Provident by Burzynski were admitted as Plaintiff's Exhibit 89.

64. The claim forms were processed by Provident's AMA claim unit at its home office in Chattanooga, Tennessee.

65. A copy of the AMA Group Policy was admitted into evidence as Plaintiff's Exhibit 79. On page 3, the policy states:

> Covered Expenses—"Covered Expenses" means incurred expenses for the services and supplies set out in this definition. Covered Expenses are subject to: the provisions of the "Limitations and Exclusions" sub-section; and, the conditions not defined. Such services and supplies must be certified: by the attending Physician; and, as necessary for the treatment of injury or illness. Charges for services and supplies must not exceed reasonable and customary charges which are generally made: in the same locality; and, under similar conditions.

66. On pages 3 and 4, the policy sets forth limitations on the definition of "other medical services and supplies:"

> Other Medical Services and Supplies—includes all of the services and supplies next listed:
>
> \*       \*       \*
>
> Drugs and medicines as next described. They must be lawfully obtainable only upon a Physician's written prescription. The must be approved by the U.S. Food and Drug Administration for general use by humans; and . . . .

67. Smith testified, and the parties agree, that Provident paid Burzynski $12,440.00 for his treatment of Medow.

68. Hadley lived in Belen, New Mexico, and subscribed to the New Mexico State Police Officers Group Medical Plan, which was underwritten and administered by Provident. The parties agree that this plan is not governed by ERISA.

69.     Hadley, who also suffered from seizures, was diagnosed with a malignant brain tumor in October 1992.

70.     Burzynski treated Hadley from November 1, 1993, until February 1, 1994.

71.     Burzynski submitted HCFA 1500 claim forms to Provident for Hadley's treatment using CPT Codes 96414, 99205, 36415, and 99215.

72.     Copies of the claim forms were admitted into evidence as Plaintiff's Exhibit 70.

73.     The insurance claim forms for Hadley were processed by Provident's Regional Claims Office in Phoenix, Arizona.

74.     A copy of Provident's Plan for the State of New Mexico Police Officers was admitted into evidence as Plaintiff's Exhibit 55.

75.     On page 36, the plan states:

**Usual and customary Charge—**For any service or supply, the Usual and Customary Charge will not exceed the lesser of:

(a)     the amount customarily charged by the provider for it; or
(b)     the charge for the service or supply made by providers of comparable services or supplies in the same locality.

A special provision will apply when there are not providers of comparable services or supplies in the same locality, in the event of an unusual type of service or supply. When this happens, the Provident will decide whether the charge is appropriate based on:

(a)     the complexity involved;
(b)     the degree of professional skill required;
(c)     the cost of supplies; and
(d)     other pertinent factors.

The Provident may decline to pay flat rate charges when procedures, fees and/or time involved are not itemized.

13

76.    On page 37, the plan defines experimental services:

**Experimental and/or Investigational Services and Supplies**—Medical, surgical, dental or psychiatric services, devices or supplies (other than drugs or medicines) which are not:

(1)    safe;
(2)    effective; and
(3)    appropriate;

For the diagnosis or treatment or the Injury or Illness.

If the service, device, or supply is a drug or medicine, it will be considered Experimental and/or Investigational if:  It cannot be purchased or is not approved by the F.D.A. for public use for any purpose; and has not been proven:

(1)    safe;
(2)    effective; and
(3)    appropriate

For the diagnosis or treatment of the Injury or Illness.

For the purposes of this Plan, the Provident reserves the right to make the final decision as to whether the services, supplies, or devices are Experimental and/or Investigational under this definition.

77.    On page 39, the plan explains that

Covered expenses are for the services and supplies shown below.  The services or supplies must be both:  (a) medically necessary for treatment or diagnosis of Injury or Illness; and (b) ordered or prescribed by a Physician.  Charges will be covered only to the extent that they do not exceed the Usual and Customary Charges generally made in the same locality under similar conditions.

78.    The plan, beginning on page forty-one, also lists expenses "paid at 80%."

These expenses include:

•      Physician's fees for non-surgical medical care . . . .
                              *       *       *
•      Drugs and medicines which can be legally obtained only by the written prescription of a Physician and which are approved by the U.S. Food and Drug Administration for general use by humans.

14

79.     Beginning on page 49, the plan also lists limitations and exclusions from coverage.  It states:

Benefits will not be paid for charges for:

                                        *        *        *

- •     medical exams not required for treatment of an Injury or Illness . . . .
- •     Experimental and/or Investigational Services.
- •     services or supplies for which you are not required to pay.

80.     Burzynski and his clinic billed a daily charge of $342.50 under CPT Code 96414 for each day Hadley was treated with antineoplastons.

81.     Beyond intravenous treatment with antineoplastons, Burzynski's records indicate that Hadley was also treated with Dilantin, Decadron, Aldactazide, Phenobarbital, and Tegretol.

82.     The parties agree that Provident paid Burzynski $3,262.00 for Hadley's treatment.

83.     Provident sent a letter to Burzynski around December 13, 1993, requesting that he return $130.00 that had been paid erroneously for Hadley's treatment due to its experimental nature.

84.     Gallagher lives in Morganville, New Jersey, and participated, through her husband, in the Middlesex County College Employees Group Medical Plan, which was administered by Provident.  The parties agree that this plan is governed by ERISA.

85.     In April 1994, Gallagher was diagnosed with stage IV intermediate grade Non-Hodgkin's Lymphoma with metastatic disease in her bone marrow.

86.     Gallagher started treatment with Burzynski on May 18, 1994, and continued at least through the termination of the trial.

CHPDF - www.fastio.com

87. Gallagher testified that, although the treatment with antineoplastons has not cured her cancer, her health has improved.

88. Burzynski billed Provident for Gallagher's treatment using HCFA 1500 forms specifying CPT Codes 96414 and 99215.

89. Copies of the claim forms submitted by Burzynski to Provident for the treatment of Gallagher were admitted into evidence as Plaintiff's Exhibits 17 and 18.

90. Gallagher's claim forms were processed by the Provident Regional Claims Office in Bristol, Tennessee.

91. A copy of the Group Insurance Plan for Middlesex County College was admitted into evidence as Plaintiff's Exhibit 2.

92. The plan defines "covered expense" on page 16.

"Covered expense" includes only the charges for the medical services and supplies which are furnished to an insured person for the diagnosis and treatment of an illness, are of the usual type furnished for such purpose, have been authorized by a doctor and do not exceed the usual and customary charges within the area in which the expense was incurred.

93. On page 17, the plan specifies that the definition of covered expenses does not include "Supplies and services for which no charge is made or for which the insured person is not required to pay."

94. On page 19, the plan defines "doctor visits" as:

Services furnished by a licensed doctor for the diagnosis and treatment of an illness or injury are covered provided:

1. The services rendered are the usual type furnished for the particular illness or injury.

16

CHPDF - www.fastio.com

2.     The fee charged for treatment of the illness/injury does not exceed the usual and customary charges within the area in which the expense is incurred.

As to prescription drugs, page 19 of the plan states:

Prescription drugs and medicines are eligible for major medical coverage provided the drugs/medicines:

1.     Are used in the treatment of an illness or injury.

2.     Can only be obtained with a doctor's prescription.

3.     Can be legally obtained in the United States.

4.     Are not experimental drugs.

5.     Are approved for use by the Food and Drug Administration for public dispensing by a doctor.

95.     Provident paid for Gallagher's treatment between May and September 1994. Provident sent a letter to Burzynski, dated February 21, 1995, and admitted into evidence as Plaintiff's Exhibit 15, informing him:

UPON FURTHER CONSIDERATION OF THESE CLAIMS, WE FIND THESE PAYMENTS WERE INCORRECTLY MADE BECAUSE THE MIDDLESEX COUNTY COLLEGE PLAN OF BENEFITS EXCLUDES ANY TYPE OF TREATMENT THAT IS EXPERIMENTAL OR INVESTIGATIONAL.  IT ALSO EXCLUDES DRUGS THAT HAVE NOT BEEN APPROVED FOR USE BY THE FOOD AND DRUG ADMINISTRATION FOR PUBLIC DISPENSING BY A DOCTOR.  THIS ALSO INCLUDES ANY EXPENSES RELATED TO TREATMENT.

OUR CORRECT PAYMENT SHOULD HAVE BEEN $ .00; THEREFORE, YOU HAVE BEEN OVERPAID BY $24087.92.

96.     Provident's internal correspondence, admitted into evidence as Plaintiff's Exhibit 24, demonstrates that its employees had doubts about whether the HCFA 1500s submitted by Burzynski were for covered expenses.  One notation states that

17

CHECKED WITH LEGAL ON THIS AND THEY AGREE THAT WE CAN GIVE IT A SHOT BY USING THE EXCLUSION IN THEIR PLAN LANGUAGE THAT STATES SERVICES ARE COVERED PROVIDED: THE SERVICES RENDERED ARE THE USUAL TYPE FURNISH [sic].

97.     Gallagher testified, "I have an affinity for, you know, unconventional therapies." Further, she stated, "I started to do some reading, and I was drawn further away and looked at alternative offerings and decided that Dr. Burzynski sounded, to me, personally, he sounded the best prospect."

98.     Subsequent to Provident's term administering Gallagher's medical plan, Prudential administered the plan.

99.     Gallagher testified that Prudential paid for the medication provided by Burzynski "for about two or three weeks." When asked whether Prudential paid for the medication, Gallagher's husband—Brenden Gallagher ("Mr. Gallagher")—testified that Prudential "paid a small amount at some stage. But basically, the answer is no. It was experimental."

100.    The parties agree that Provident paid Burzynski $24,576.00 on behalf of Gallagher.

101.    Harvey lived in Iva, South Carolina, and obtained medical benefits through the Michelin Tire Company ("Michelin") Group Medical Plan, which was administered by Provident. The parties agree that this plan is governed by ERISA.

102.    In September 1992, Harvey was diagnosed with xanthosarcoma of the brain, a rare and usually fatal cancer.

103. The testimony of Plaintiff's expert witness, Dr. Harry Price ("Price")—an oncologist who practices in Houston—indicated that there are no chemotherapeutic agents specifically approved for xanthosarcoma of the brain.

104. Harvey underwent surgery followed by radiation treatments in 1992. His treatment entailed a second surgery in January 1993 and stereotactic radiosurgery in February 1993. In August 1993, he began treatment with combination chemotherapy. Despite these treatments, the tumor continued to progress.

105. Harvey commenced treatment with antineoplastons on November 20, 1993, and continued such treatment until his death on January 7, 1994.

106. Burzynski billed Provident for Harvey's treatment using HCFA 1500 forms specifying CPT Codes 96414, 99205, 99215, and 99070.

107. Copies of the claim forms submitted by Burzynski to Provident for Harvey's treatment were admitted into evidence as Plaintiff's Exhibit 104.

108. Harvey's claim forms were sent to and were processed by Provident's Regional Claims Office in Greenville, South Carolina.

109. A copy of the Michelin Medical Care & Prescription Drug Plan was admitted into evidence as Plaintiff's Exhibit 92.

110. The plan defines "covered expense" on page 9.

**Covered Expenses**—Covered Expenses are charges for the services and supplies listed under the Plan. The Services or supplies must be both: (a) medically necessary for treatment or diagnosis of Injury or Illness; and (b) ordered or prescribed by a Physician.

Charges will be covered only to the extent that they do not exceed Usual and Customary Charges generally made in the same locality under similar conditions.

19

111.    The plan defines experimental and investigational services on page 9.

**Experimental and/or Investigational Services**—Services which have not been clinically proven to be safe and effective based upon available professional assessments. The Plan reserves the right to make the final determination in case a dispute should arise.

112.    The term "medical necessity" is defined on page 10 of the plan.

**Medical Necessity**—
Medically Necessary and/or Medical Necessity—Services or supplies provided by a Hospital, Physician, or other qualified provider, as determined by Provident are Medically Necessary if:

*       *       *

3.    commonly and usually noted throughout the provider's profession as proper in the treatment of you or your Dependent's diagnosed condition, disease, Injury or Illness; and . . . .

*       *       *

The fact that a Physician has performed or prescribed a procedure or treatment does not mean that it is Medically Necessary.  For purposes of this Plan, the Claim Fiduciary will make the final decision as to whether Services or supplies are Medically Necessary under the preceding definition.

113.    Usual and customary charges are discussed on page 11 of the plan.

**Usual and Customary Charge**—For any service or supply, the Usual and Customary Charge will not exceed:

1.    the amount customarily charged by the provider for it; or
2.    the charge for the service or supply made by providers of comparable services or supplies in the same locality.

A special provision will apply when there are no providers of comparable services or supplies in the same locality, or in the event of an unusual type of service or supply.    When this happens, the Plan will decide whether the charge is appropriate, based on:

a.    the complexity involved;
b.    the degree of professional skill required;
c.    the cost of supplies; and
d.    other pertinent factors.

Payment may be declined for flat rate charges when procedures, fees and/or time involved are not itemized.

20

114. On page 13, the plan describes the limitations and exclusions from coverage:

**Limitation and Exclusions**—Benefits will not be paid for charges for:

\*     \*     \*

10. Experimental and/or Investigational Services;

\*     \*     \*

12. services or supplies not specifically listed under Covered Expenses in this Section;

\*     \*     \*

15. drugs and medicines not furnished by and administered during confinement as a bed-patient in a Hospital . . . .

115. On page 17, in the section of the plan dealing with prescription drugs, the plan states:

**Covered Drugs**

The plan covers those drugs which are lawfully obtainable only from a licensed pharmacist upon the written order (the prescription) of a physician licensed to practice medicine. These drugs are commonly referred to as "Legend Drugs." If a compounded medication contains one or more Legend Drugs, it qualifies for coverage under the program. Injectable insulin is not a Legend Drug, but it will be covered if it is obtained on a prescription from the doctor.

116. On page 18, the plan states:

**Drug Plan Exclusions**

No benefits are payable for the following:

\*     \*     \*

Drugs labeled: "Caution—limited by federal law to investigational use" or experimental drugs, even though a charge is made to the individual.

117. On page 5, the plan provides Provident with discretion to determine whether admission to a hospital is medically necessary.

118. A copy of the Administrative Services Agreement between Provident and Michelin was admitted as Plaintiff's Exhibit 130.

21

119. The Agreement states that Provident has discretion to "negotiate discounts with providers, to reduce charges and to adjust claim reimbursements . . . .;" "negotiate reduction in claim charges and claim reimbursements according to the Provident Case Management Service Program . . . .;" and "[d]etermine the qualifications of claims submitted . . . ."

120. The Agreement further states that "[i]f Provident has overpaid a claim, Provident shall take all reasonable steps to recover the overpayment and all recoveries will be credited to the Employer."

121. Provident paid Burzynski for Harvey's treatment by the issuance of six checks between January 4 and February 18, 1994.

122. Copies of the checks issued by Provident to Burzynski, totaling $12,725.75, were admitted as Plaintiff's Exhibit 105.

123. Smith's testimony indicated that Provident also reimbursed Harvey for supplies, including his purchase of a pump to facilitate treatment with antineoplastons, in the amount of $6,225.50.

124. Carroll lived in Rockaway Township, New Jersey, and participated, through her father, in the Sherwin-Williams Company Salaried Employees Group Medical Plan administered by Provident. The parties agree that this plan is governed by ERISA.

125. In November 1990, Carroll was diagnosed with ovarian cancer. She underwent surgery on several occasions and began a high-dose regime of chemotherapy, followed by an experimental high-dose chemotherapy protocol. By the end of January 1992, she experienced rapid tumor growth and complications. She then underwent radiation therapy.

126.   Burzynski began treating Carroll on May 22, 1992, at which time her cancer was terminal and she had no conventional treatment options.   She was treated by Burzynski until her death on August 9, 1992.

127.   Burzynski billed Provident for Carroll's treatment using HCFA 1500 forms specifying CPT Codes 96414, 99205, 99215, and 36415.

128.   Copies of the claim forms submitted by Burzynski to Provident for the treatment of Carroll were admitted into evidence as Plaintiff's Exhibit 119.

129.   Carroll's claims were processed by Provident's Regional Claims Office in Cincinnati, Ohio.

130.   A copy of the Group Comprehensive Health Coverage Plan for the Salaried Employees of the Sherwin-Williams Company was admitted into evidence as Plaintiff's Exhibit 107.

131.   On page 1, the plan states:

Benefits are payable on a Reasonable and Customary Fee basis for Covered Medical Expenses incurred by you and your eligible Dependents according to the options listed below.

132.   The plan also states, on page 11, that:

The specific items of medical expense that make up Covered Medical Expenses include expenses incurred for services or supplies certified by the attending Physician as medically necessary for the treatment of Illness or Injury not to exceed the Reasonable and Customary Fee.

133.   On pages 11 and 12, the plan sets forth the extent of coverage:

**WHAT IS COVERED**

The following list of Covered Medical Expenses describes the types of services and treatments payable by this Plan up to the Reasonable and Customary Fee. These items are covered when certified and medically necessary by your

23

CMPDF - www.fastio.com

Physician. Charges are considered to have been incurred for services or supplies on the date the service or supply was received.

\* \* \*

**Physician's Fees and Related Services**

\* \* \*

• Drugs and medicines which can be legally obtained only by a written prescription of a Physician and which are approved by the U.S. Food and Drug Administration for general use by humans other than those covered under the Sherwin-Williams Company drug maintenance drug program.

134. On pages 18-20, the plan also sets forth the medical expenses that are not covered under the plan:

**MEDICAL EXPENSES NOT COVERED**

This Plan is a comprehensive medical plan designed to cover most aspects of your health care. The following items, however, are NOT payable under this Plan. This Plan does not recognize charges for services or supplies (other than with notable exceptions) incurred for:

\* \* \*

• Medical examinations not necessary for the treatment of injury or illness.

\* \* \*

• Experimental and/or investigative services that have not been clinically proven to be safe and effective based upon current available professional assessments. (Provident reserves the right to make the final determinations should a dispute arise).

\* \* \*

• Services or supplies not specifically listed under Covered Medical Expenses in this Section.

135. The term "covered medical expenses" is defined on page 67 of the plan.

**Covered Medical Expenses**—Charges for services, treatment, or supplies certified by the attending Physician to be medically necessary, including items of medical expense for which Comprehensive Medical Expense Benefits may be payable under this Plan. A Covered Medical Expense cannot exceed the Reasonable and Customary Fee. Covered Medical Expenses include most types of Hospital, surgical, and medical care expenses required for the diagnosis and treatment of Injury or Illness.

136. The plan defines "reasonable and customary fee" on page 71.

**Reasonable and Customary Fee**—Medical Care—For any service or supply, the Reasonable and Customary Fee is defined as the lesser of:

24

- Amount customarily charged by the provider; or
- Charge for the service or supply made by providers of comparable services or supplies in the same locality.

In no event will this Plan pay in excess of the Reasonable and Customary Fee. The Plan will pay for covered expenses **up to** the Reasonable and Customary Fee for such charges.

A special provision applies when there are no providers of comparable services or supplies in the same locality, or in the event of unusual type of service or supply.    When this occurs, Provident will decide whether the charge is appropriate based on the following criteria:

- The complexity involved;
- The degree of professional skill required;
- The cost of supplies; and
- Other pertinent factors.

In no event will the Plan pay in excess of the Reasonable and Customary Fee. The Plan will only pay for Covered Expenses up to the Reasonable and Customary Fee for such charges.

137.    Provident issued 11 checks to Burzynski for the treatment of Carroll between June 17, 1992, and August 21, 1992.  Copies of the checks were admitted into evidence as Plaintiff's Exhibit 120.

138.    The parties agree that Provident paid Burzynski $21,232.50 for his treatment of Carroll.    Additionally, Provident reimbursed Carroll for $1,382.90 and paid $467.00 to Damon Clinical Labs on her behalf.

139.    Burzynski required McKeeby, Medow, and Hadley to sign waivers which stated:

Under federal law (as determined in a prior legal proceeding between Dr. Burzynski and the Food & Drug Administration), Dr. Burzynski is only permitted to treat patients with Antineoplastons in the state of Texas.  Neither he nor anyone associated with him is permitted to ship his medication out of the state. Transportation of Antineoplastons out of the state of Texas by a patient or his or

25

her agent could be viewed as a violation of the federal Food and Drug Laws, which carries civil and possible criminal sanctions.

140.    Burzynski's waiver form required a deposit of $3,000.00 from McKeeby, $5,000.00 from Medow, and $6,000.00 from Hadley.  These forms state:

PATIENT agrees to deposit the sum of $ _____ as an initial deposit with the Burzynski Clinic to start treatment with Antineoplastons, which sum of money will be retained by the Clinic until treatment is completed, even if PATIENT'S insurance carrier determines in advance that it will pay 100% of the cost of this treatment.  PATIENT understands that the reason for this is in the unfortunate event that PATIENT'S insurance carrier initially determines it will pay 100% for the treatment and then decides thereafter that it will not pay.

Copies of the respective waivers were admitted into evidence as Plaintiff's Exhibits 6, 39, and 60.

141.    Even if it had not been illegal for Burzynski to administer, ship, or transport antineoplastons, Burzynski knew or should have known that it was illegal to charge for an experimental drug that was not approved by the FDA.  *See* 21 C.F.R. § 312.7(d).  Burzynski contends, however, that in his submission of HCFA 1500 forms to Provident he was not attempting to bill for his provision of antineoplastons to the respective patients.  Rather, he asserts that he was charging for the ancillary services related to the provision of antineoplastons.  For several reasons, this assertion is not credible.

142.    As mentioned above, in billing Provident for the treatment of McKeeby, Burzynski denoted the type of treatment using  CPT Codes 96414, 96549, 99215, and 99358.  For Hadley and Carroll, Burzynski used CPT Codes 36415, 96414, 99205, and 99215.  For Medow, Burzynski used Codes 96549, 99205, and 99215.  For Harvey, Burzynski utilized Codes 96414, 99070, 99205, and 99215.  For Gallagher, Burzynski used Codes 36415, 90782, 96414, 99205, and 99215.

26

143. According to the AMA, CPT Code 96414 denotes "administration of chemotherapy by infusion technique, initiation of prolonged infusion (more than 8 hours), requiring the use of a portable or implantable pump."

144. None of the HCFA 1500 claim forms submitted to Provident by Burzynski for the treatment of McKeeby, Hadley, Harvey, or Gallagher, contained an identification of the drug being administered, whether by IV-infusion or by capsule. The forms submitted for Medow's treatment have a typed notation in the "Explain Unusual Services or Circumstances" column which states: "7 TRTMTS CHEMOTHERAPY ANPA @ $45EA." Similarly, some of the forms submitted for Carroll's treatment state "HIGH DOSE ANPA CHEMOTHERAPY-IV INFUSION," while others do not specify the nature of the treatment.

145. Although Burzynski frequently billed for daily administration of antineoplastons, the patients generally were self-administering the antineoplastons at their homes, great distances from Burzynski's clinic. Burzynski's staff periodically checked on their progress by means of telephone calls to the patients.

146. Contrary to Burzynski's assertion that he was billing for his services and not for the drugs administered, the billing records for the patients indicate that the amount Burzynski charged was proportional to the dosage of the drug. Hence, the amount claimed from Provident increased as the amount of antineoplastons administered to the patients increased. Burzynski averred that this proportionality was not a result of charging for the antineoplastons, but, rather, was based on the extra care required by patients receiving increased dosages. Considering that the alleged extra care and attention Burzynski provided consisted largely of

CMPDF - www.fastio.com

periodic telephone calls by his staff to the patients and little, if anything else, this assertion lacks merit.

      147.    Price testified that he knew of no doctor or clinic that makes a daily charge for chemotherapy administration when there is no direct contact with the patient. He further opined that the use of CPT Code 96414 was not appropriate when the patient was self-administering the chemotherapy agent at home. Price also testified that his clinic does not charge for telephone calls to patients.

      148.    The testimony of Mr. Gallagher also indicates that Burzynski was actually charging for the antineoplastons, and not just for the ancillary monitoring of the patients. When asked why Burzynski's internal forms specify that billing will be done on a per dosage basis despite the fact that Burzynski allegedly was not charging for the drug itself, Mr. Gallagher responded that "I was basically aware of the situation, that technically he was not allowed to charge for the drug." He further testified that an increase in the dosage of the antineoplastons resulted in a commensurate increase in the amount charged by Burzynski.

      149.    Accordingly, Burzynski's assertion that he was not billing Provident for the antineoplastons is not credible. Moreover, he knew or should have known that his treatment was illegal based on the applicable federal and state laws, United States District Judge Gabrielle McDonald's ("Judge McDonald") injunction of May 24, 1984, and United States District Judge Norman Black's ("Judge Black") Memorandum and Order issued October 15, 1992. Indeed, the waiver form that Burzynski required McKeeby, Medow, and Hadley to sign acknowledges the illegality of distributing antineoplastons outside of Texas. Burzynski's own testimony also

CMPDF - www.fasoo.com

indicates that he knew his treatment with antineoplastons was unusual and not an ordinary form of chemotherapy.

150.  Through a series of letters dated October 26, 1988, through March 8, 1989,  Provident refused to pay for the treatment of one of Burzynski's patients, Jennifer K. Stokes ("Stokes").  All of the letters tersely state:

> WE HAVE AN ASSIGNMENT FOR THE ABOVE CHARGES; HOWEVER, BECAUSE OF THE PLAN DEDUCTIBLE OR OTHER POLICY PROVISION, NO BENEFITS ARE AVAILABLE.  IF YOU HAVE ANY QUESTIONS, PLEASE CONTACT YOUR PATIENT WHO HAS BEEN FURNISHED A FULL EXPLANATION OF OUR HANDLING.

Copies of the letters were admitted into evidence as Defendant's Exhibit 21.

151.  Provident also denied the claims of two other Burzynski patients—Neal Dublinsky ("Dublinsky") and Jennifer Kern—based on the experimental nature of the treatment. In a letter to Dublinsky, dated August 16, 1990, Provident's Claim Administration Supervisor Marilyn M. Mason ("Mason") stated:

> [W]e have on file information that medication used in Dr. Burzynski's chemotherapy treatment has not been FDA approved.  Your group health plan contract with Davis, Markel and Edwards excludes benefits for experimental and/or investigational services.   Therefore, based on this information[,] chemotherapy treatment provided by Dr. Burzynski will continue to be denied.

A copy of this letter was admitted into evidence as Defendant's Exhibit 20-a.  The return address on the letter is 1 Fountain Square, Chattanooga, TN 37402.

152.  Subsequent to this letter, Burzynski's office corresponded with Mason and Becky Williams ("Williams")—a Provident Senior Consumer Inquiry Analyst.  In a letter to Williams, dated December 18, 1990, Barbara Fleming—Burzynski's Administrator—stated:

29

I want to state clearly once again that Neal Dublinsky's treatment was not experimental or investigational. He received the customary medical care from his Houston physician, which was effective in eradicating his cancerous symptoms.

The success of his particular medical care is due to the ANPA chemotherapy he received. "ANPA chemotherapy" is a comprehensive treatment that involves a great deal, often including several drugs, with a comprehensive charge. We do not sell the drug or drugs to the patient. Neal Dublinsky's peculiar medical condition, the medication he was taking already and various chemotherapeutic drugs were skillfully manipulated to his advantage. Neal Dublinsky is not part of a clinical trial. He simply received specialized medical care.

A copy of this letter was admitted into evidence as Defendant's Exhibit 20-c.

153.   On December 13, 1993, Provident's Claims Office in Phoenix, Arizona,

sent Burzynski a letter about Hadley's treatment which states:

UPON FURTHER CONSIDERATION OF THIS CLAIM, WE FIND THIS PAYMENT WAS INCORRECTLY MADE BECAUSE THIS TYPE OF TREATMENT HAS NOT BEEN FDA APPROVED AND IS CONSIDERED EXPERIMENTAL AT THIS TIME.   ACCORDING TO THE INSUREDS POLICY, INVESTIGATIONAL OR EXPERIMENTAL DRUGS ARE NOT A COVERED EXPENSE.

A copy of this letter was admitted into evidence as Plaintiff's Exhibit 74.

154.   Also, Mr. Gallagher testified that in a telephone conversation with an

unidentified Provident employee—possibly Jones—in January or February 1995, the employee

expressed doubts concerning whether antineoplastons were approved by the FDA.

155.   In a letter to Burzynski dated October 12, 1995, Provident sought further

information from Burzynski about McKeeby's treatment.  The letter states:

WE HAVE RECEIVED A CLAIMS [sic] FOR CHEMOTHERAPY FOR DATES OF SERVICE 7-1-95 THROUGH 9-13-95.

PLEASE SEND US A DETAILED REPORT SHOWING WHAT MEDICINES ARE CONTAINED IN THE CHEMOTHERAPY PROVIDED TO THE PATIENT.

30

A copy of this letter was admitted into evidence as Plaintiff's Exhibit 52.

156.     Based on the information contained in these letters and the testimony of Mr. Gallagher, it is apparent that some of Provident's employees knew that Burzynski had previously billed Provident for experimental treatment, and that at least by August 16, 1990, Provident knew that compensation for treatment with antineoplastons was not available under some of its plans.

B.     Conclusions of Law

Prior Litigation Concerning Burzynski

1.     The legality of Burzynski's treatment with antineoplastons under both state and federal law has been litigated or addressed in numerous lawsuits over the past fifteen years.

2.     In 1983, the United States sued Burzynski alleging violations of the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq. See United States v. Burzynski Cancer Research Inst.*, No. H-83-2069 (S.D. Tex. 1983).   On May 24, 1984, Judge McDonald "prohibited Burzynski from distributing his antineoplastons treatment into interstate commerce, but did not forbid intrastate distribution of the drug." *Trustees of the Northwest Laundry & Dry Cleaners Health & Welfare Trust Fund v. Burzynski*, 27 F.3d 153, 155 (5th Cir. 1994), *cert. denied*, 513 U.S. 1155 (1995).

3.     In 1987, in the former case, but addressing a different issue, the Fifth Circuit stated in *dicta* that Judge McDonald's order "expressly allowed Dr. Burzynski to continue manufacturing and prescribing the drug in Texas." *United States v. Burzynski*, 819 F.2d 1301, 1305 (5th Cir. 1987), *cert. denied*, 484 U.S. 1065 (1988).

31

4.      In 1991, a pension fund initiated an action similar to the present case in which it sought to recover funds paid to Burzynski.      Judge Black held that Burzynski's provision of antineoplastons to a resident of Oregon violated Judge McDonald's injunction. *See Trustees of the Northwest Laundry & Dry Cleaners Health & Welfare Trust Fund v. Burzynski*, No. H-91-347, 1992 WL 677890, at *3 (S.D. Tex. Oct. 15, 1992), *aff'd*, 27 F.3d 153 (5th Cir. 1994), *cert. denied*, 513 U.S. 1155 (1995).  Judge Black also held, and the Fifth Circuit agreed, that Burzynski had committed civil fraud and was liable to the fund for the amount erroneously paid. *See id.*

5.      In 1995, Burzynski was indicted in a 75-count indictment which charged, *inter alia*, insurance fraud and violations of the 1984 injunction by treating out-of-state patients. After an initial mistrial, United States District Judge Sim Lake dismissed the insurance fraud charges.    During the second trial, the prosecutor dismissed all remaining charges except a contempt of court charge.  The jury acquitted Burzynski of this charge. *See United States v. Burzynski*, No. H-95-290 (S.D. Tex. 1995).

6.      The legality of treatment with antineoplastons under Texas law was also the subject of extensive litigation.  In 1988, the Texas State Board of Medical Examiners filed an administrative action against Burzynski, claiming that his use of an unapproved drug was a violation of the Texas Food, Drug and Cosmetic Act.  On March 10, 1994, Administrative Law Judge Earl A. Corbitt ("Judge Corbitt") of the Texas Office of Administrative Hearings issued a proposed decision finding that it was legal for Burzynski to use his non-FDA approved medicine on his own patients.  Judge Corbitt's Proposal for Decision was admitted into evidence as Defendants' Exhibit 13.

7.    On administrative review, the Texas Medical Board ("the Board") rejected Judge Corbitt's findings and held that Burzynski's use of the treatment was illegal under Texas law. The Board's decision did not go into effect, however, as Burzynski obtained a temporary restraining order and preliminary injunction pending judicial review of the Board's decision.

8.    On February 3, 1995, Texas District Judge Paul Davis ("Judge Davis") reversed the Board's order and dismissed the administrative action against Burzynski. A copy of Judge Davis's order was admitted into evidence as Defendants' Exhibit 14. In February 1996, however, the Austin Court of Appeals reversed the district court and reinstated the Board's order, including in its findings that the use of antineoplastons without FDA approval violated Texas law. *See State Bd. of Med. Exam'rs v. Burzynski*, 917 S.W.2d 365, 369 (Tex. App.—Austin 1996, writ denied).

9.    Accordingly, at all times relevant to this litigation, it was illegal under both federal and state law for Burzynski to dispense antineoplastons to his patients. *See Northwest Laundry*, 27 F.3d at 155; *State Bd. of Med. Exam'rs*, 917 S.W.2d at 369.

    Fraud and Misrepresentation

10.    As mentioned above, the parties agree that ERISA does not apply to the plans in which McKeeby, Medow, and Hadley participated.

11.    Because this court's jurisdiction over the claims involving the non-ERISA plans arises by virtue of the parties' diversity of citizenship, this court must apply the substantive law of the forum state. *See Randall v. Arabian Am. Oil Co.*, 778 F.2d 1146, 1150 (5th Cir. 1985); *Ayo v. Johns-Manville Sales Corp.*, 771 F.2d 902, 909 n.4 (5th Cir. 1985). This includes the state's choice of law rules. *See Randall*, 778 F.2d at 1150.

33

12.   The parties appear to agree that Texas law governs the fraud and misrepresentation claims concerning the payments made on behalf of McKeeby, Medow, and Hadley.

13.   Under Texas law, to recover for fraud, the plaintiff must establish that:

(1)   the defendant made a material representation concerning an existing fact;

(2)   the representation was false when it was made;

(3)   the speaker knew the misrepresentation was false, or made it recklessly without knowledge of its truth and as a positive assertion;

(4)   the speaker made the misrepresentation with the intent that it should be acted upon;

(5)   the plaintiff acted with justifiable reliance on the misrepresentation; and

(6)   the plaintiff's reliance resulted in its injury.

*See Oppenheimer v. Prudential Sec. Inc.*, 94 F.3d 189, 194 (5th Cir. 1996); *Kollar v. United Transp. Union*, 83 F.3d 124, 126 (5th Cir. 1996); *Carnival Leisure Indus., Ltd. v. Aubin*, 53 F.3d 716, 718 (5th Cir. 1995); *Norman v. Apache Corp.*, 19 F.3d 1017, 1022 (5th Cir. 1994); *Eagle Properties Ltd. v. Scharbauer*, 807 S.W.2d 714, 723 (Tex. 1990); *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex. 1990), *cert. denied*, 498 U.S. 1048 (1991).

14.   Under Texas law, to recover for negligent misrepresentation, the plaintiff must establish that:

(1)   a representation was made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest;

(2)   the defendant supplied "false information" for the guidance of others in their business;

(3)   the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and

34

(4)     the plaintiff suffered pecuniary loss by justifiably relying on the representation. *See Clardy Mfg. Co. v. Marine Midland Bus. Loans, Inc.*, 88 F.3d 347, 356 (5th Cir. 1996), *cert. denied*, 117 S. Ct. 740 (1997); *see also FDIC v. Patel*, 46 F.3d 482, 486 (5th Cir. 1995); *FDIC v. Calhoun*, 34 F.3d 1291, 1297 & n.4 (5th Cir. 1994); *Crenshaw v. General Dynamics Corp.*, 940 F.2d 125, 128 (5th Cir. 1991); *Sears, Roebuck & Co. v. Meadows*, 877 S.W.2d 281, 282 (Tex. 1994); *Federal Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991).

15.     For both fraud and negligent misrepresentation, the plaintiff must prove "justifiable reliance" on the misrepresentation. *See Clardy Mfg. Co*, 88 F.3d at 358; *Scottish Heritable Trust, PLC v. Peat Marwick Main & Co.*, 81 F.3d 606, 615 (5th Cir.), *cert. denied*, 117 S. Ct. 182 (1996); *Geosearch, Inc. v. Howell Petroleum Corp.*, 819 F.2d 521, 526 (5th Cir. 1987); *Airborne Freight Corp. v. C.R. Lee Enter., Inc.*, 847 S.W.2d 289, 294 (Tex. App.—El Paso 1992, writ denied). "The justifiability of the reliance is judged in the light of the plaintiff's intelligence and experience." *Scottish Heritable Trust*, 81 F.3d at 615; *see Clardy Mfg. Co.*, 88 F.3d at 358; *Haralson v. E.F. Hutton Group, Inc.*, 919 F.2d 1014, 1026 (5th Cir. 1990). If a party is sophisticated and experienced, "that may be evidence that he did not rely on the seller's representations but on his own expertise. The degree of sophistication is evidence for the trier of fact to consider in deciding the issue of reasonable or justifiable reliance." *Lutheran Bhd. v. Kidder Peabody & Co.*, 829 S.W.2d 300, 308 (Tex. App.—Texarkana), *vacated on other grounds*, 840 S.W.2d 384 (Tex. 1992).

16.     To determine justifiability, "courts inquire whether—given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud—it is extremely unlikely that there is actual reliance on the

plaintiff's part." *Clardy Mfg. Co.*, 88 F.3d at 360 (quoting *Haralson*, 919 F.2d at 1026); *see Scottish Heritable Trust*, 81 F.3d at 615; *Quest Exploration & Dev. Co. v. Transco Energy Co.*, 24 F.3d 738, 742 (5th Cir. 1994); *Beijing Metals & Minerals Import/Export Corp. v. American Bus. Ctr., Inc.*, 993 F.2d 1178, 1186 (5th Cir. 1993).

17. "Reliance is unjustified when the relying party is negligent." *Scottish Heritable Trust*, 81 F.3d at 615 (citing RESTATEMENT (SECOND) OF TORTS § 552A (1977)); *see Clardy Mfg. Co.*, 88 F.3d at 358. The "justifiable reliance" requirement entails a weightier burden when proving negligent misrepresentation than in the fraud context. *See Clardy Mfg. Co.*, 88 F.3d at 360 n.22 (citing *Haralson*, 919 F.2d at 1025 & n.5); *Roberts v. United New Mexico Bank*, 14 F.3d 1076, 1078 n.2 (5th Cir. 1994); *Dupuy v. Dupuy*, 551 F.2d 1005, 1018 (5th Cir.), *cert. denied*, 434 U.S. 911 (1977).

18. Constructive notice, however, affords no defense to an action for negligent misrepresentation. *See Spence v. Omaha Indem. Ins. Co.*, 996 F.2d 793, 797 (5th Cir. 1993); *Ojeda de Toca v. Wise*, 748 S.W.2d 449, 451 (Tex. 1988). Likewise, a plaintiff's failure to investigate will not defeat an action for fraud, as the defrauded party is entitled to rely on the fraudulent party's representations. *See Roberts*, 14 F.3d at 1080; *Koral Indus. v. Security-Conn. Life Ins. Co.*, 802 S.W.2d 650, 651 (Tex. 1990); *Kessler v. Fanning*, 953 S.W.2d 515, 519 (Tex. App.—Fort Worth 1997, no writ). Yet, "'knowledge of facts that would lead a reasonably prudent person to conduct further inquiry to clarify a misimpression or reveal a misrepresentation can be deemed equivalent to knowledge of the truth.'" *Roberts*, 14 F.3d at 1080 (quoting *Gibraltar Sav. v. LD Brinkman Corp.*, 860 F.2d 1275, 1303 (5th Cir. 1988), *cert. denied*, 490 U.S. 1091 (1989)). This duty of inquiry "'extends only to matters that are fairly

36

suggested by facts that are actually known, rather than circumstances that merely arouse suspicion in the mind of a reasonably prudent person.'" *Roberts*, 14 F.3d at 1080 (quoting *Holmes v. P.K. Pipe & Tubing, Inc.*, 856 S.W.2d 530, 543 (Tex. App.—Houston [1st Dist.] 1993, no writ)).

19.    "The reasonableness of a person's reliance on a particular representation is to be determined by the nature of the representation and the circumstances surrounding the making of the representation." *Smith v. Harrison County*, 824 S.W.2d 788, 793 (Tex. App.—Texarkana 1992, no writ); *see Bykowicz v. Pulte Home Corp.*, 950 F.2d 1046, 1050-51 (5th Cir.) (citing *General Motors Corp. v. Courtesy Pontiac, Inc.*, 538 S.W.2d 3, 6 (Tex. Civ. App.—Tyler 1976, no writ) (no justifiable reliance where representations were such that any person of normal intelligence, experience, and education "'would recognize at once as preposterous . . . or which are shown by facts within his observation to be so patently and obviously false that he must have closed his eyes to avoid discovery of the truth'")), *cert. denied*, 506 U.S. 822 (1992). "Put another way, there must be a reasonable relation between the contents of the defendant's misrepresentation and the action the plaintiff took in reliance." *Geosearch, Inc.*, 819 F.2d at 526. "A person cannot be barred from recovery for fraud simply because he could have discovered the fraud had he exercised reasonable diligence." *Lutheran Bhd.*, 829 S.W.2d at 308.

20.    Fraud by non-disclosure is a subcategory of fraud that occurs when a party with a duty to disclose facts fails to make such disclosures. *See Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997). It also arises when a party, with or without a duty to disclose, makes a partial disclosure. *See Northwest Laundry*, 27 F.3d at 157; *Boggan v. Data*

37

*Sys. Network Corp.*, 969 F.2d 149, 154 (5th Cir. 1992); *Southeastern Fin. Corp. v. United Merchants & Mfrs., Inc.*, 701 F.2d 565, 566 (5th Cir. 1983). Fraud by nondisclosure is actionable because "the non-disclosure may be as misleading as a positive misrepresentation of facts." *Swanson*, 959 S.W.2d at 181. "Just as with affirmative misrepresentations, the allegedly defrauded party must have reasonably relied on the silence to his detriment." *American Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d 420, 436 (Tex. 1997).

21.    Absent a partial disclosure or a "fiduciary or confidential relationship, the failure to disclose information is not actionable as fraud." *Mitchell Energy Corp. v. Samson Resources Co.*, 80 F.3d 976, 985 (5th Cir. 1996) (citing *Tempo Tamers, Inc. v. Crow-Houston Four, Ltd.*, 715 S.W.2d 658, 669 (Tex. App.—Dallas 1986, writ ref'd n.r.e.)). "The existence of a fiduciary relationship is a question of fact . . . ." *United Teachers Assocs. Ins. Co. v. Mackeen & Bailey, Inc.*, 99 F.3d 645, 649 (5th Cir. 1996); *see Crim Truck & Tractor Co. v. Navistar Int'l Trans. Co.*, 823 S.W.2d 591, 594 (Tex. 1992). Certain relationships, however, give rise to a fiduciary duty as a matter of law. *See Crim Truck & Tractor Co.*, 823 S.W.2d at 593-94; *see also Floors Unlimited, Inc. v. Fieldcrest Cannon, Inc.*, 55 F.3d 181, 188 (5th Cir. 1995). "Under Texas law, a fiduciary duty will not be lightly created, as it imposes extraordinary duties." *Floors Unlimited, Inc.*, 55 F.3d at 188. "Texas Courts determine whether a fiduciary relationship exists on a case by case basis." *Mackeen & Bailey Inc.*, 99 F.3d at 649 (citing *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962)).

22.    A duty to disclose arises where a fiduciary or confidential relationship exists. *See Imperial Premium Fin., Inc. v. Khoury*, 129 F.3d 347, 352 (5th Cir. 1997); *Bay Colony, Ltd. v. Trendmaker, Inc.*, 121 F.3d 998, 1004 (5th Cir. 1997).

38

> A confidential relationship exists when 'one party is in fact accustomed to being guided by the judgment or advice of another, or is justified in placing confidence in the belief that such party would act in its interests.'

*Thompson v. Vinson & Elkins*, 859 S.W.2d 617, 624 (Tex. App.—Houston [1st Dist.] 1993, writ denied) (quoting *Thames v. Johnson*, 614 S.W.2d 612, 614 (Tex. Civ. App.—Texarkana 1981, no writ)).  Confidential relationships may arise "'where one person trusts in and relies upon another, whether the relation is a moral, social, domestic or merely personal one.'"  *Crim Truck & Tractor Co.*, 823 S.W.2d at 594 (quoting *Fitz-Gerald v. Hull*, 237 S.W.2d 256, 261 (Tex. 1951)); *see also Northwest Laundry*, 27 F.3d at 158.

23.  "A fiduciary relationship 'exists in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed . . . .'"  *Mackeen & Bailey, Inc.*, 99 F.3d at 649 (quoting *Texas Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 507 (Tex. 1980)).  "It exists where a special confidence is reposed in another who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence."  *Moore*, 595 S.W.2d at 507.  A fiduciary relationship, however, will not be found where the parties occupy "naturally antagonistic positions."  *See, e.g., Floors Unlimited, Inc.*, 55 F.3d at 188.  Further, "'mere subjective trust alone is not enough to transform arms length dealing into a fiduciary relationship . . . .'"  *Mackeen & Bailey, Inc.*, 99 F.3d at 649 (quoting *Locke*, 363 S.W.2d at 253).

24.  A duty to speak may also arise from partial disclosure, for by providing incomplete statements, "'one may convey a false impression by the disclosure of some facts and the concealment of others.'"  *Southeastern Fin. Corp.*, 701 F.2d at 566-67 (quoting *International Sec. Life Ins. Co. v. Finck*, 475 S.W.2d 363, 370 (Tex. Civ. App. 1971), *aff'd in part and rev'd*

39

*in part on other grounds*, 496 S.W.2d 544 (Tex. 1973)); *see Santanna Nat. Gas Corp. & Women's Natural Gas Corp. v. Hamon Operating Co.*, 954 S.W.2d 885, 891 (Tex. App.—Austin 1997, writ filed).

25. In the present instance, Burzynski does not dispute that his statements on the HCFA 1500 forms submitted to Provident constituted material representations concerning an existing fact.

26. As to the second element of fraud, by submitting the claim forms to Provident, Burzynski implicitly represented that his treatment was ordinary chemotherapy, properly administered, and in accordance with all applicable state and federal laws. Both the Fifth Circuit and the Texas Court of Appeals at Austin found that it was illegal for Burzynski to administer or distribute antineoplastons intrastate or interstate. *See Northwest Laundry*, 27 F.3d at 155; *State Bd. of Med. Examiners*, 917 S.W.2d at 369. Further, the Fifth Circuit found that it was misleading for Burzynski to represent to an insurance company that he was treating a patient with chemotherapy without divulging that a non-FDA-approved and unusual form of therapy was being used. *See Northwest Laundry*, 27 F.3d at 159. Therefore, Burzynski's implicit representation of lawfulness and ordinariness was false when it was made.

27. As to the third element, none of the claim forms submitted by Burzynski to Provident, each with his signature at the bottom, advised Provident that the substance being administered as chemotherapy was an unusual, illegal, and non-FDA-approved drug.

28. As noted above, on May 24, 1984, Judge McDonald enjoined "Burzynski from distributing his antineoplastons treatment into interstate commerce . . . ." *See Northwest Laundry*, 27 F.3d at 155. Furthermore, federal law mandates:

40

> No person shall introduce or deliver for introduction into interstate commerce any
> new drug, unless an approval of an application filed pursuant to subsection (b) or
> (j) of this section is effective with respect to such drug.

21 U.S.C. § 355(a). "[E]veryone is charged with knowledge of the United States Statutes at

large, and their enactment gives legal notice of their contents." *Marshall v. A & M Consol.*

*Indep. Sch. Dist.*, 605 F.2d 186, 191 (5th Cir. 1979).

29. There is a similar Texas statute:

> A person shall not sell, deliver, offer for sale, hold for sale or give away any
> new drug unless:
>
> > (1) an application with respect thereto has been approved and the approval
> > has not been withdrawn under Section 505 of the federal act; and
>
> > (2) a copy of the letter of approval or approvability issued by the Federal
> > Food and Drug Administration is on file with the commissioner if the
> > product is manufactured in this state.

TEX. HEALTH & SAFETY CODE ANN. § 431.114(a).

30. As mentioned above, Burzynski admits that antineoplastons were not

approved by the FDA during the time period at issue here. Further, he required McKeeby,

Medow, and Hadley to sign waivers which informed them that Burzynski was only permitted

to treat patients with antineoplastons in Texas and that transportation of antineoplastons to other

states could be viewed as a violation of federal law.

31. Burzynski's waiver form required a deposit of $3,000.00 from McKeeby,

$5,000.00 from Medow, and $6,000.00 from Hadley, which was to be returned only if their

insurance carrier paid for the treatment.

41

32.     In a previous suit, Burzynski testified that at least by 1987 "he suspected that antineoplastons were being transported out of Texas." *Burzynski Cancer Research Inst.*, 819 F.2d at 1309.

33.     Judge McDonald's injunction, federal statutes, and Texas law also provided Burzynski with knowledge that the interstate and intrastate distribution of antineoplastons was illegal.   Despite this knowledge, Burzynski sought payment from Provident for antineoplastons that he at least suspected had been transported interstate.   Such conduct demonstrates reckless disregard for the truth.

34.     Furthermore, by 1991, the Northwest Laundry and Dry Cleaners Health and Trust Fund sought to recoup payments made to Burzynski by means of a claim of fraud. As noted above, Judge Black's Memorandum and Order of October 15, 1992, unambiguously informed Burzynski that his billing practices were fraudulent.  The Memorandum and Order stated:

> As to the Plaintiff's fraud claim, Plaintiffs have established that Defendant, both in the manner that he presented his claim forms to Plaintiffs on behalf of the insured and in his correspondence with Plaintiffs, failed to disclose the questionable legitimacy of his treatment.  Defendant never disclosed to Plaintiffs that his drug treatment was not approved by the FDA nor that his treatment was anything other than standard "chemotherapy."
> *          *          *
> [T]he Court finds that Defendant has not complied with the statutory requirements and that he knew or should have known that his treatment was in violation of Texas law.

*Trustees of Northwest Laundry*, 1992 WL 677890, at *3.

35.     His submission of claim forms to Provident, in which he failed to inform Provident of the nature of his treatment, its extraordinary character, or its illegality, constitute

42

representations which Burzynski knew were false or which were made with reckless disregard for the truth.

36.     As to the fourth element, Burzynski does not deny that he submitted the claim forms with an intent that they would be acted upon.  Rather, it was apparent from his testimony that Burzynski's primary reason for submitting the forms was to induce Provident to act upon his assertions contained therein and, ultimately, pay him for the treatment of the patients.

37.     With respect to the fifth element, Provident demonstrated that reliance on HCFA 1500 claims forms is standard throughout the insurance and health care industry.

38.     Smith—Provident's Claims Supervisor—testified that in making payments to Burzynski, Provident relied on the monetary amounts stated on the HCFA 1500 claim forms submitted by Burzynski.

39.     Burzynski asserts that Provident's reliance on the claim forms was not justifiable, because at the time he submitted the claim forms, Provident knew that his treatment was experimental.  Burzynski bases this assertion on the fact that Provident had previously rejected claims from Burzynski on the basis that his treatment was experimental and was not approved by the FDA.

40.     Provident argues that the knowledge of the experimental nature of Burzynski's treatment, possessed by individual employees, cannot be imputed to Provident, as it has many employees and processed the claims at issue from geographically and administratively distinct offices.

43

CMPDF - www.fastio.com

41.     A corporation is a legal fiction which can act and acquire knowledge only through its agents. *See City State Bank v. United States Fid. & Guar. Co.*, 778 F.2d 1103, 1109 (5th Cir. 1985); *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 391 (Tex. 1997); *International Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 580 (Tex. 1963); *Hirsch v. Texas Lawyers' Ins. Exch.*, 808 S.W.2d 561, 563 (Tex. App.—El Paso 1991, writ denied); *Angroson, Inc. v. Independent Communications, Inc.*, 711 S.W.2d 268, 273-74 (Tex. App.—Dallas 1986, writ ref'd n.r.e.).

42.     Accordingly, the general rule of agency law is that an agent's knowledge with respect to a matter over which his authority extends is imputed to his principal when the agent is acting within the scope of his authority. *See Askanase v. Fatjo*, 130 F.3d 657, 666 (5th Cir. 1997); *Thomas v. N.A. Chase Manhattan* Bank, 1 F.3d 320, 325 (5th Cir. 1993) (construing New York law); *Seven Elves, Inc. v. Eskenazi*, 704 F.2d 241, 245 (5th Cir. 1983); *La Sara Grain Co. v. First Nat'l Bank of Mercedes*, 673 S.W.2d 558, 563 (Tex. 1984). "The knowledge of the agent is the knowledge of the company itself." *Maryland Ins. Co. v. Head Indus. Coatings & Servs. Inc.*, 906 S.W.2d 218, 228 (Tex. App.—Texarkana 1995), *rev'd on other grounds*, 938 S.W.2d 27 (Tex. 1997); *see Haralson*, 919 F.2d at 1026; *Continental Oil Co. v. Bonanza Corp.*, 706 F.2d 1365, 1376 (5th Cir. 1983); *Norwood v. Litwin Eng'rs & Constructors, Inc.*, 962 S.W.2d 220, 225 (Tex. App.—Houston [1st Dist.] 1998, writ denied). This rule is based upon the theory that it is "the duty of the agent to communicate to his principal the knowledge possessed by him relating to the subject matter of the agency, material to the principal's protection and interest, and the presumption that he has performed his duty . . . ." *Martin v. Xarin Real Estate, Inc.*, 703 F.2d 883, 890 (5th Cir. 1983); *see Todd*

44

*Shipyards Corp. v. Turbine Serv., Inc.,* 467 F. Supp. 1257, 1297 (E.D. La. 1978), *aff'd in part, rev'd in part and modified in part on other grounds*, 674 F.2d 401 (5th Cir.), *cert. denied*, 459 U.S. 1036 (1982).

        43.     Despite Provident's contention that its offices are so vast and distinct as to preclude such imputation of knowledge, courts have found that knowledge possessed by employees and agents of insurance companies is imputed to the company. *See Pitts v. American Security Life Ins. Co.*, 931 F.2d 351, 356 (5th Cir. 1991) (holding that, under federal common law, the knowledge of an ERISA fiduciary's agent is imputable to the fiduciary); *Union Nat'l Bank of Little Rock v. Moriarty*, 746 S.W.2d 249, 251 (Tex. App.—Texarkana 1987, writ denied); *Jefferson Amusement Co. v. Lincoln Nat'l Life Ins. Co.*, 409 F.2d 644, 650 (5th Cir. 1969) (citing *National Life Ins. Co. of Texas v. Neves*, 370 S.W.2d 144, 146 (Tex. Civ. App.—Eastland 1963, writ ref'd n.r.e.) (soliciting agent's knowledge of prior illness is imputed to company)). As the Fifth Circuit observed, "we daily impute to mammoth corporations knowledge of the activities of their myriad employees." *United States v. Beasley*, 576 F.2d 626, 631 (5th Cir. 1978), *cert. denied*, 440 U.S. 947 (1979).

        44.     In a similar case, the Texas Court of Appeals held that knowledge possessed by personnel in one division of an insurance company was imputable to the entire company:

> The carrier argues that knowledge acquired by its personnel in its medical claim division would not be imputed to its personnel in its death claims division . . . . We reject this contention. Admittedly, as argued by the carrier, modern business technology as applied to corporate office procedures and the necessity for departmentalization has brought about more specialized job functions and delegation of authority in the chain of command, and employee responsibilities are perhaps more narrowly defined than ever before. However, the decisions as to methods of operation and delegation of authority are peculiarly within the

45

CMPDF - www.fazsa.com

> province of the corporation. Management is free to organize and conduct its affairs as it may see fit, but in doing so, it may not narrow and limit its liabilities and responsibilities to third parties with whom it deals.

*McDonald v. McDonald*, 632 S.W.2d 636, 639-40 (Tex. App.—Dallas 1982, writ ref'd n.r.e.).

45.     This court, therefore, imputes to Provident its agents' knowledge that Burzynski previously used, and billed Provident for, treatment with a drug that was experimental or had not been approved by the FDA.

46.     Further, Provident knew that at least some of its plans had been interpreted as not requiring compensation for experimental or non-FDA-approved treatments.

47.     Moreover, Provident is a sophisticated and experienced claims administrator.

48.     Knowledge that Burzynski treated patients with antineoplastons, that antineoplastons were experimental or not approved by the FDA, and that some of Provident's policies did not require payment for experimental or non-FDA-approved treatments would lead a reasonably prudent claims administrator to conduct further inquiry concerning whether HCFA 1500 claim forms from Burzynski were seeking payment for non-FDA-approved treatment. *See Roberts*, 14 F.3d at 1080.

49.     Under these facts, Provident has not shown that its reliance on Burzynski's misrepresentations was justifiable. *See Clardy Mfg. Co.*, 88 F.3d at 358. Accordingly, Provident's claims for fraud and negligent misrepresentation must be rejected.

Unjust Enrichment

50.     Provident also seeks recovery from Burzynski based on a theory of unjust enrichment. The parties agree that Texas law applies to this claim.

51.     "The aim of the equitable doctrine of unjust enrichment is to redistribute benefits unfairly held by one party at the expense of the other in a situation not covered by contract . . . ." *Need v. HECI Exploration Co.*, 942 S.W.2d 212, 220 (Tex. App.—Austin 1997, writ granted).

52.     The unjust enrichment doctrine falls under the measure of damages known as restitution or quasi-contract. *See Burlington N. R.R. Co. v. Southwestern Elec. Power Co.*, 925 S.W.2d 92, 96-97 (Tex. App.—Texarkana 1996, no writ).  The term "characterizes the result of failing to make restitution for benefits received under circumstances giving rise to an implied or quasi-contract." *Transamerican Natural Gas Corp. v. Finkelstein*, 933 S.W.2d 591, 600 (Tex. App.—San Antonio 1996, writ denied).

53.     Unjust enrichment, however, "is not an independent cause of action but rather characterizes the result of a failure to make restitution of benefits under circumstances which give rise to an implied or quasi-contractual obligation to return the benefits." *Amoco Production Co. v. Smith*, 946 S.W.2d 162, 163 (Tex. App.—El Paso 1997, no writ); *Microsoft Corp. v. Manning*, 914 S.W.2d 602, 609 (Tex. App.—Texarkana 1995, writ dism'd); *City of Corpus Christi v. Heldenfels Bros., Inc.*, 802 S.W.2d 35, 40 (Tex. App.—Corpus Christi 1990), *aff'd*, 832 S.W.2d 39 (Tex. 1992).

54.     "A cause of action for money had and received belongs conceptually to the doctrine of unjust enrichment." *Amoco Production Co.*, 946 S.W.2d at 164; *Burlington N. R.R. Co.,* 925 S.W.2d at 101 n.5.  Accordingly, this court construes Provident's "unjust enrichment" claim as a claim for money had and received. *See Amoco Production Co.*, 946 S.W.2d at 164; *see also Austin v. Shalala*, 994 F.2d 1170, 1176 & n.5 (5th Cir. 1993); *McNair*

47

*v. City of Cedar Park*, 993 F.2d 1217, 1219-20 (5th Cir. 1993); *Jamail, Inc. v. Carpenters Dist. Council of Houston Pension & Welfare Trusts*, 752 F. Supp. 741, 743 (S.D. Tex. 1990) (equating restitution with an action for money had and received), *aff'd in part and rev'd in part on other grounds*, 954 F.2d 299 (5th Cir. 1992).

55.     An action for money had and received arises when a defendant obtains money "which in equity and good conscience belongs to the plaintiff." *Amoco Production Co.*, 946 S.W.2d at 164; *see McNair*, 993 F.2d at 1221; *Miller-Rogaska, Inc. v. Bank One, Tex., N.A.*, 931 S.W.2d 655, 662 (Tex. App.—Dallas 1996, no writ); *Auston v. Duval*, 735 S.W.2d 647, 649 (Tex. App.—Austin 1987, writ denied); *Staats v. Miller*, 243 S.W.2d 686, 687 (Tex. 1951). Thus, in assessing a claim for restitution or for money had and received, "the essential question is whether there is 'the unjust retention of benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience.'" *Starcraft Co. v. C.J. Heck Co. of Tex., Inc.*, 748 F.2d 982, 988 (5th Cir. 1984) (quoting *Fun Time Ctrs., Inc. v. Continental Nat'l Bank*, 517 S.W.2d 877, 884 (Tex. Civ. App.—Tyler 1974, writ ref'd n.r.e.)).

56.     In the present case, it is undisputed that Burzynski received a benefit from Provident insofar as he received $174,511.02 for the treatment of McKeeby, Medow, and Hadley.

57.     A balancing of the equities entails a close look at the circumstances under which Burzynski obtained this money from Provident.

58.     Provident paid Burzynski on behalf of McKeeby, Medow, and Hadley based on contracts for treatment with antineoplastons between the patients and Burzynski.

48

59.    As mentioned above, Burzynski's provision of antineoplastons to McKeeby, Medow, and Hadley violated both federal and Texas law.

60.    Under the law of Texas, Florida, New Jersey, and California, illegal contracts are void and unenforceable and cannot be the basis for an action in law or equity. *See United Realty Corp. v. Green Valley Acres, Inc.*, 792 F.2d 1555, 1557 (11th Cir. 1986); *Vitapro Foods, Inc. v. State of Tex. ex rel. Dep't of Criminal Justice*, No. 06-96-00089-CV, 1998 WL 175603, at *4 (Tex. App.—Texarkana Apr. 16, 1998, no writ); *Whalen v. Schoor, DePalma & Canger Group, Inc.*, 702 A.2d 1311, 1314 (N.J. Super. Ct. App. Div. 1997); *TCA Bldg. Co. v. Northwestern Resources Co.*, 922 S.W.2d 629, 635 (Tex. App.—Waco 1996, writ denied); *Davidson Bros., Inc. v. D. Katz & Sons, Inc.*, 643 A.2d 642, 647 (N.J. Super. Ct. App. Div. 1994); *Castro v. Sangles*, 637 So.2d 989, 990 (Fla. Dist. Ct. App. 1994); *Green v. Mt. Diablo Hosp. Dist.*, 254 Cal. Rptr. 689, 695 (Cal. Ct. App. 1989); *R.M. Sherman Co., Inc. v. W.R. Thomason, Inc.*, 236 Cal. Rptr. 577, 579 (Cal. Ct. App. 1987).

61.    Similarly, a court will not give effect to an illegal contract to the detriment of an innocent third party. *See Baker v. Raymond Int'l, Inc.*, 656 F.2d 173, 182 (5th Cir. 1981).

62.    In balancing the equities, this court also considers that Burzynski made misrepresentations to Provident and acted so as to conceal the true nature of the treatment.

63.    Furthermore, each of the plans at issue excluded coverage for the type of treatment provided.

49

64.     Specifically, McKeeby's policy excluded coverage for services and supplies which were not "generally furnished for cases of comparable nature and severity in the particular geographical area concerned."

65.     Medow's policy provided coverage for drugs and medicines with the proviso that "[t]hey must be lawfully obtainable only upon a Physician's written prescription. They must be approved by the U.S. Food and Drug Administration for general use by humans . . . ."

66.     Hadley's plan excluded coverage for services or supplies that were "Experimental or Investigational" or "not approved by the F.D.A. for public use for any purpose . . . ."

67.     As Burzynski received monetary benefits for treatment which the Fifth Circuit and the Texas Court of Appeals at Austin have found to be illegal, permitting him to retain these funds would be unjust and contrary to the fundamental principles of equity and good conscience.

68.     Moreover, as each of the applicable plans excluded antineoplastons from their respective scope of coverage, there is an additional element of unfairness in permitting Burzynski to retain the payments in question.

69.     Accordingly, Provident has demonstrated that it is entitled to restitution from Burzynski under its claim for "unjust enrichment."

ERISA Preemption

70.     It is undisputed that the plans in which Gallagher, Harvey, and Carroll participated were "employee benefit plans" as defined by ERISA. *See* 29 U.S.C. §§ 1002-1003.

50

71.     The Supremacy Clause empowers Congress to enact laws that supersede state law by means of an express provision in a federal statute, by implication, or by creating a direct conflict between federal and state law. *See* U.S. CONST. art. VI; *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995). An express provision of ERISA states that it "shall supersede any and all State laws insofar as they may now or hereafter relate to an employee benefit plan . . . ." 29 U.S.C. § 1144(a); *see Dowden v. Blue Cross & Blue Shield of Tex., Inc.*, 126 F.3d 641, 643 (5th Cir. 1997); *Nickel v. Estes*, 122 F.3d 294, 297 (5th Cir. 1997). "State law" includes "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." 29 U.S.C. § 1144(c).

72.     Courts have noted that the ERISA preemption provision is "clearly expansive," has a "broad scope," and an "expansive sweep." *See California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, ___, 117 S. Ct. 832, 837 (1997); *District of Columbia v. Greater Washington Bd. of Trade*, 506 U.S. 125, 129 (1992); *Nickel*, 122 F.3d at 297. Accordingly, the words "relate to" are intended to apply in their broadest sense. *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 98 (1983); *Vega v. National Life Ins. Servs., Inc.*, 145 F.3d 673, ___, No. 97-20645, 1998 WL 347186, at *1 (5th Cir. June 30, 1998); *E-Systems, Inc. v. Pogue*, 929 F.2d 1100, 1103 (5th Cir.), *cert. denied*, 502 U.S. 981 (1991).

73.     A state law relates to a covered employee benefit plan for purposes of ERISA "'if it has a connection with or reference to such a plan.'" *District of Columbia*, 506 U.S. at 129 (quoting *Shaw*, 463 U.S. at 96-97); *see Travelers Ins. Co.*, 514 U.S. at 656; *Vega*, 1998 WL 347186, at *1; *Dowden*, 126 F.3d at 643; *Kramer v. Smith Barney*, 80 F.3d 1080,

51

1083 (5th Cir. 1996). ERISA preemption is designed to protect plan participants by eliminating the threat of inconsistent state and local regulations and to standardize the laws to permit the nationally uniform administration of employee benefit plans. *See Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138 (1990); *Fort Halifax Packing Co. Inc. v. Coyne*, 482 U.S. 1, 10-11 (1987); *Texas Life, Accident, Health & Hosp. Serv. Ins. Guar. Ass'n v. Gaylord Entertainment Co.*, 105 F.3d 210, 217 (5th Cir.), *cert. dismissed*, 117 S. Ct. 2501 (1997); *Peckham v. Gem State Mut.*, 964 F.2d 1043, 1051 (10th Cir. 1992) (preemption prevents a plan from being subjected to conflicting State regulations).

> In enacting the preemption provision of ERISA, Congress sought to ensure the plans and plan sponsors would be subject to a uniform body of benefit law; the goal was to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government.

*Ingersoll-Rand Co.*, 498 U.S. at 139; *Singer*, 964 F.2d at 1452. Accordingly, ERISA may preempt a related state law even if the state law is not specifically intended to regulate ERISA-governed plans. *See Ingersoll-Rand Co.*, 498 U.S. at 139; *Nickel*, 122 F.3d at 297; *see also Boggs v. Boggs*, ___ U.S. ___, 117 S. Ct. 1754, 1762 (1997) (holding that ERISA preempts application of state's community property law); *First Nat'l Life Ins. Co. v. Sunshine-Jr. Food Stores, Inc.*, 960 F.2d 1546, 1549 (11th Cir. 1992) (holding that ERISA preempts state law claims against employer alleging an improper payment of benefits), *cert. denied*, 506 U.S. 1079 (1993).

74.     "[W]here a claim relates to an employee benefit plan governed by ERISA and is 'based upon state law of general application and not a law regulating insurance,' the state law cause of action is preempted by ERISA." *Cypress Fairbanks Med. Ctr., Inc. v. Pan-*

52

*American Life Ins. Co.*, 110 F.3d 280, 284 (5th Cir.), *cert. denied*, 118 S. Ct. 167 (1997); *see Hermann Hosp. v. MEBA Medical & Benefits Plan*, 845 F.2d 1286, 1290 (5th Cir. 1988). Preemption does not occur, however, "if the state law has only a tenuous, remote, or peripheral connection with covered plans, as is the case with many laws of general applicability." *District of Columbia*, 506 U.S. at 130 n.1 (citation and internal quotations omitted); *see Operating Eng'rs Health & Welfare Trust Fund v. JWJ Contracting Co.*, 135 F.3d 671, 677 (9th Cir. 1998).

75.     In determining whether a law is preempted, courts must look to the objectives of ERISA and the nature of the effect of state law on ERISA plans. *See Dillingham Constr.*, 117 S. Ct. at 838; *Travelers*, 514 U.S. at 656; *JWJ Contracting Co.*, 135 F.3d at 678.

76.     One objective of ERISA is to remedy or "prevent transactions which dissipate or endanger trust assets." *Herberger v. Shanbaum*, 897 F.2d 801, 803 (5th Cir.), *cert. denied*, 498 U.S. 817 (1990).

77.     "ERISA preempts a state law claim 'if (1) the state law claim addresses an area of exclusive federal concern, such as the right to receive benefits under the terms of an ERISA plan; and (2) the claim directly affects the relationship between the traditional ERISA entities—the employer, the plan and its fiduciaries, and the participants and beneficiaries.'" *Smith v. Texas Children's Hosp.*, 84 F.3d 152, 155 (5th Cir. 1996) (quoting *Hubbard v. Blue Cross & Blue Shield Ass'n*, 42 F.3d 942, 945 (5th Cir.), *cert. denied*, 515 U.S. 1122 (1995)); *accord Cypress Fairbanks*, 110 F.3d at 283; *Hook v. Morrison Milling Co.*, 38 F.3d 776, 781 (5th Cir. 1994).

CIVPDF - www.fastio.com

78.     Preventing fiduciaries from recovering "'benefits which are not part of the written terms of the program disrupts the actuarial balance of the Plan and potentially jeopardize[s] the pension rights of others legitimately entitled to receive them.'" *Central States Southeast & Southwest Areas Health & Welfare Fund v. Neurobehavioral Assocs.*, 53 F.3d 172, 175 (7th Cir. 1995) (quoting *Cummings v. Briggs & Stratton Retirement Plan*, 797 F.2d 383, 389 (7th Cir.), *cert. denied*, 479 U.S. 1008 (1986)); *see Malden Mills Indus., Inc. v. Alman*, 971 F.2d 768, 778 (1st Cir. 1992); *Black v. TIC Inv. Corp.*, 900 F.2d 112, 115 (7th Cir. 1990); *Chambless v. Masters, Mates & Pilots Pension Plan*, 772 F.2d 1032, 1041 (2d Cir. 1985), *cert. denied*, 475 U.S. 1012 (1986). "Pension funds which are unable to recover mistaken payments may be less inclined to sponsor ERISA-qualifying plans." *Neurobehavioral Assocs.*, 53 F.3d at 175.

79.     An insurer's right to recover mistaken payments is "essential to ERISA's purposes." *Neurobehavioral Assocs.*, 53 F.3d at 175; *see Provident Life & Accident Ins. Co. v. Waller*, 906 F.2d 985, 989 (4th Cir. 1990) (holding that plan administrator's claim of unjust enrichment against beneficiary may not be predicated on state law given ERISA's broad preemption provision), *cert. denied*, 498 U.S. 982 (1990); *see also Jamail*, 954 F.2d at 305. Suits by plan fiduciaries to recover wrongful payments "tend to preserve the integrity of ERISA-governed funds, which is consonant with the central goals of ERISA." *Blue Cross & Blue Shield v. Weitz*, 913 F.2d 1544, 1548 (11th Cir. 1990); *see Heller v. Fortis Benefits Ins. Co.*, 142 F.3d 487, 495 (D.C. Cir. 1998) (such suits "safeguard 'the corpus of funds set aside' under the plan").

54

80. Here, Provident's state law claims for fraud, misrepresentation, and unjust enrichment concern allegedly mistaken payments made to Burzynski for the treatment of ERISA plan beneficiaries. Subjecting these plans to the differing laws of various states could create conflicts in construing the plans. *See Peckham*, 964 F.2d at 1051. Further, as the claims at issue directly relate to the receipt of medical benefits from ERISA-governed plans, they encroach upon an area of exclusive federal concern. *See Waller*, 906 F.2d at 992-93; *Kwatcher v. Massachusetts Serv. Employees Pension Fund*, 879 F.2d 957, 966 (1st Cir. 1989) (holding that ERISA preempted a state law restitution claim); *Plucinski v. I.A.M. Nat'l Pension Fund*, 875 F.2d 1052, 1057-58 (3d Cir. 1989).

81. A primary purpose of ERISA is to ensure the integrity of the underlying plans. *See Duggan v. Hobbs*, 99 F.3d 307, 309-10 (9th Cir. 1996); *Van Orman v. American Ins. Co.*, 680 F.2d 301, 312 (3d Cir. 1982). Preventing a fiduciary from recovering mistaken payments to a provider has the potential to upset the actuarial balance of the plans, endanger trust assets, and jeopardize the rights of the proper beneficiaries. *See Herberger*, 897 F.2d at 803; *Heller*, 142 F.3d at 495.

82. Provident's claims directly affect the relationship between traditional ERISA entities, as they directly relate to the fiduciary, the assets of the funds in question, and the extent to which a health care provider is remunerated for services provided to fund beneficiaries. *See Dowden*, 126 F.3d at 643; *Suggs v. Pan Am. Life Ins. Co.*, 847 F. Supp. 1324, 1334 (S.D. Miss. 1994). The expansive contours of ERISA demand uniformity in the law related to claims for erroneous payment of benefits. *See Gaylord Entertainment Co.*, 105 F.3d at 217; *First Nat'l Life Ins. Co. v. Sunshine-Jr. Food Stores, Inc.*, 960 F.2d 1546, 1549 (11th

Cir. 1992) (holding that ERISA preempts state law claims against an employer alleging an improper payment of benefits). Because Provident's right to recover mistaken payments is essential to ERISA's purposes, its state law claims for fraud, misrepresentation, and "unjust enrichment" are preempted by ERISA. *See Rokohl v. Texaco, Inc.*, 77 F.3d 126, 129 (5th Cir. 1996); *Waller*, 906 F.2d at 992; *Lee v. E.I. Dupont de Nemours & Co.*, 894 F.2d 755, 756 (5th Cir. 1990); *Kentucky Laborers Dist. Council Health & Welfare Fund v. Hope*, 861 F.2d 1003, 1005 (6th Cir. 1988) (fraud and restitution claims to recover benefits allegedly received in violation of ERISA plan are preempted by ERISA); *Whitworth Bros. Storage Co. v. Central States*, 794 F.2d 221, 233, 235 (6th Cir.) (employer's claim for restitution relates to an ERISA benefit plan so federal law applies to the claim), *cert. denied*, 479 U.S. 1007 (1986).

### ERISA's Civil Enforcement Provision

83.     Although ERISA preempts Provident's state law claims under the Gallagher, Harvey, and Carroll plans, the statute expressly authorizes suits for equitable relief.

84.     ERISA provides in pertinent part:

> A civil action may be brought . . . by a participant, beneficiary, or fiduciary  (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain *other appropriate equitable relief* (i) to redress such violation or (ii) to enforce any provisions of this subchapter or the terms of the plan . . . .

29 U.S.C. § 1132(a)(3) (emphasis added).

85.     "Equitable relief" under ERISA includes "those categories of relief that were typically available in equity (such as injunction, mandamus, and restitution, but not compensatory damages)." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256 (1993); *see Brett v. Jefferson County*, 123 F.3d 1429, 1435 n.14 (11th Cir. 1997); *FMC Med. Plan v. Owens*, 122

56

F.3d 1258, 1261 (9th Cir. 1997). As in any action at equity, a party may seek such relief only when its remedy at law is inadequate. *See Member Servs. Life Ins. Co. v. American Nat'l Bank & Trust Co.*, 130 F.3d 950, 957 (10th Cir. 1997), *cert. denied*, 118 S. Ct. 1843 (1998).

86.     Although ERISA authorizes suits by fiduciaries to obtain equitable relief, the statute has not set out the specific contours of such relief. In these instances, Congress anticipated the development of a "federal common law of rights and obligations under ERISA-regulated plans." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56 (1987); *see McGurl v. Trucking Employees of North Jersey Welfare Fund, Inc.*, 124 F.3d 471, 481 (3d Cir. 1997); *Jamail*, 954 F.2d at 303. Where ERISA fails to address a particular issue, "federal courts are expected to develop a body of federal common law to fill the interstitial gap in the statutory mandate." *Regents of the Univ. of Mich. v. Employees of Agency Rent-A-Car Hosp. Ass'n*, 122 F.3d 336, 339 (6th Cir. 1997); *see Jamail*, 954 F.2d at 303; *Fox Valley & Vicinity Constr. Workers Pension Fund v. Brown*, 897 F.2d 275, 281 (7th Cir.), *cert. denied*, 498 U.S. 820 (1990). The power to develop federal common law does not, however, allow the courts *carte blanche* to rewrite the legislation. *See Jamail*, 954 F.2d at 304.

87.     Courts may "'draw guidance from analogous state law' in ascertaining the applicable federal common law . . . only to the extent that it is not inconsistent with congressional policy concerns." *Wegner v. Standard Ins. Co.*, 129 F.3d 814, 818 (5th Cir. 1997) (quoting *Brandon*, 18 F.3d at 1325); *see Perez v. Aetna Life Ins. Co.*, No. 95-1111, 1998 WL 347611, at *6 (6th Cir. July 1, 1998); *Todd v. AIG Life Ins. Co.*, 47 F.3d 1448, 1451 (5th Cir. 1995). It is generally the case, however, that federal common law "tracks the consensus of the states, which have developed the law of restitution." *Central States, S.E. & S.W. Areas*

..

*Health & Welfare Fund v. Pathology Labs.*, 71 F.3d 1251, 1254 (7th Cir. 1995), *cert. denied*, 517 U.S. 1233 (1996).

88.     The rule adopted by the federal court must be the one "'that best comports with the interest served by ERISA's regulatory scheme.'" *Regents of the Univ. of Mich.*, 122 F.3d at 339 (quoting *PM Group Life Ins. Co. v. Western Growers Assur. Trust*, 953 F.2d 543, 546 (9th Cir. 1992)).  Courts may fashion common law only to the extent it is appropriate and necessary to effectuate the purposes of ERISA.  *See U.S. Steel Mining Co., Inc. v. District 17, United Mine Workers*, 897 F.2d 149, 153 (4th Cir. 1990).  Suits for restitution of plan assets "tend to preserve the integrity of ERISA-governed funds, which is consonant with the central goals of ERISA."  *Weitz*, 913 F.2d at 1548.

89.     "A number of courts have created an unjust enrichment remedy, permitting ERISA fiduciaries . . . to seek restitution against third parties who wrongly or mistakenly received money to which the plan is entitled."  *Heller*, 142 F.3d at 495; *see Harris Trust & Sav. Bank*, 57 F.3d at 615-16; *Malden Mills*, 971 F.2d at 774-75; *Weitz*, 913 F.2d at 1548-49; *Waller*, 906 F.2d at 994; *see also Jamail*, 954 F.2d at 304 (recognizing an employer's equitable remedy to recover overpayments to ERISA fund); *Kwatcher*, 879 F.2d at 965-66 (applying federal common law to allow restitution of overpayments to an ERISA pension fund).

90.     As to the ERISA plans at issue here, because state law remedies are preempted, Provident has no adequate remedy at law.  *See Landwehr v. Dupree*, 72 F.3d 726, 736-37 (9th Cir. 1995) (holding that where state law claims were preempted by ERISA, there was no adequate remedy at law).  Provident may, therefore, properly seek restitution under the federal common law which supplements ERISA's statutory framework.  *See Mertens*, 508 U.S.

58

at 256 (stating that traditionally equitable restitution included disgorgement of ill-gotten plan assets or profits).

Fiduciary Status

91.    ERISA requires that every plan "shall provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan." 29 U.S.C. § 1102(1).

92.    The determination of fiduciary status is a mixed question of law and fact. *See Kramer v. Smith Barney,* 80 F.3d 1080, 1084 n.2 (5th Cir. 1996) (citing *Reich v. Lancaster*, 55 F.3d 1034, 1044 (5th Cir. 1995)); *Taylor v. GWR Operating Co.*, 820 S.W.2d 908, 911 (Tex. App.—Houston [1st Dist.] 1991, writ denied).

93.    In general, "[t]here are three ways to acquire fiduciary status under ERISA: (1) being named as the fiduciary in the instrument establishing the employee benefit plan under 29 U.S.C. § 1102(a)(2); (2) being named as a fiduciary through a procedure specified in the plan instrument under 29 U.S.C. § 1102(a)(2); and (3) being a fiduciary under the provision of 29 U.S.C. § 1002(21)(A)." *Jordan v. Federal Express Corp.*, 116 F.3d 1005, 1014 n.16 (3d Cir. 1997); *Glaziers & Glassworkers Union Local No. 252 Annuity Fund v. Newbridge Sec., Inc.*, 93 F.3d 1171, 1179 (3d Cir. 1996).

94.    Under 29 U.S.C. § 1002(21)(A), a person is a fiduciary if, with respect to an ERISA plan

(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has discretionary authority or responsibility in the administration of such plan.

59

29 U.S.C. § 1002(21)(A).

95.    ERISA also states:

the term "named fiduciary" means a fiduciary who is named in the plan instrument, or who, pursuant to a procedure specified in the plan, is identified as a fiduciary (A) by a person who is an employer or employee organization with respect to the plan or (B) by such an employer and such an employee organization acting jointly.

29 U.S.C. § 1102(a)(2).

96.    "An ERISA fiduciary includes anyone who exercises discretionary authority over the plan's management, anyone who exercises authority over the management of its assets, and anyone having discretionary authority or responsibility in the plan's administration." *Reich*, 55 F.3d at 1046 (quoting *Pacificare Inc. v. Martin*, 34 F.3d 834, 837 (9th Cir. 1994)). The term "fiduciary" is generally given a liberal construction in keeping with the remedial purpose of ERISA. *See id.* (citing *American Fed'n of Unions v. Equitable Life Assurance Soc'y*, 841 F.2d 658, 662 (5th Cir. 1988)).

97.    "ERISA defines 'fiduciary' not in terms of formal trusteeship, but in functional terms of control and authority over the plan, thus expanding the universe of persons subject to fiduciary duties—and to damages . . . ." *IT Corp. v. General Am. Life Ins. Co.*, 107 F.3d 1415, 1418 (9th Cir. 1997), *cert. denied*, 118 S. Ct. 738 (1998) (quoting *Kayes v. Pacific Lumber Co.*, 51 F.3d 1449, 1459 (9th Cir.), *cert. denied*, 116 S. Ct. 301 (1995) (quoting *Mertens*, 508 U.S. at 262)); *Reich*, 55 F.3d at 1048.

98.    "A person is a fiduciary only with respect to those portions of a plan over which he exercises discretionary authority or control." *American Fed'n of Unions*, 841 F.2d at 662 (citing *Sommers Drug Store Co. Employees Profit Sharing Trust v. Corrigan Enters., Inc.*,

60

CU4PDF - www.fastio.com

793 F.2d 1456, 1459-60 (5th Cir. 1986)), *cert. denied*, 479 U.S. 1089 (1987); *Reich*, 55 F.3d

at 1047; *Pappas v. Buick Consultants, Inc.*, 923 F.2d 531, 535 (7th Cir. 1991). "A third-party

administrator who merely performs ministerial duties or processes claims is not a fiduciary."

*Reich*, 55 F.3d at 1047 (citing *Kyle Rys. v. Pacific Admin. Servs., Inc.*, 990 F.2d 513, 516 (9th

Cir. 1993)).

> [A] person who performs purely ministerial functions . . . within a framework of
> policies, interpretations, rules, practices, and procedures made by other persons
> is not a fiduciary because such person does not have discretionary authority or
> discretionary control respecting management of the plan, does not exercise any
> authority or control respecting management or disposition of the assets of the
> plan, and does not render investment advice with respect to any money or other
> property of the plan and has no authority or responsibility to do so.

29 C.F.R. § 2509.75-8 at D-2; *see IT Corp.*, 107 F.3d at 1419.

      99.    "The authority to grant, deny, or review denied claims can, however,

make one a fiduciary." *Id.*; *accord Kyle Rys.*, 990 F.2d at 517-18; *see Pacificare Inc.*, 34 F.3d

at 837-38. To be a fiduciary, one must exercise discretionary authority and control that amounts

to actual decision-making power. *See Reich*, 55 F.3d at 1049.

      100.    Gallagher's and Carroll's respective plans specifically designate Provident

as the fiduciary.

      101.    On page 46, Gallagher's plan states:

> If you are not satisfied or do not agree with the reasons for the denial of your
> claim, you may appeal the decision to:
>
> > Provident Life & Accident Insurance Company
> > Group Benefits Review Department
> > Box 2101 Terminal Annex
> > Los Angeles, California 90051
>
> This company provides the benefits under the group policy as shown on the front
> cover of this booklet. This company is the fiduciary under the plan designated

61

to review any clain [sic] appeals by you.

102.    On page 57, Carroll's plan states:  "d. The name and address of the Claims Fiduciary is:  Provident Life and Accident Insurance Company, One Fountain Square, Chattanooga, Tennessee 37402."

103.    As to Harvey, the Michelin Plan vested Provident with discretion in determining whether services, supplies, or admission to a hospital were medically necessary and thereby compensable under the Plan.

104.    Furthermore, the Administrative Services Agreement between Provident and Michelin gave Provident discretion to negotiate discounts with providers as well as reductions in claim charges and reimbursements.  The Agreement specifically authorized Provident to "take all reasonable steps to recover the overpayment."

105.    Provident had sufficient discretionary authority, control, and responsibility in the management and administration of the Michelin Plan to be deemed an ERISA "fiduciary" within the meaning of § 1002(21)(A).  Its discretionary authority and control exceeded what could properly be characterized as "purely ministerial" activities.  *See IT Corp.*, 107 F.3d at 1419-22; *see also Useden v. Acker*, 947 F.2d 1563, 1574 (11th Cir. 1991), *cert. denied*, 508 U.S. 959 (1993).

106.    Therefore, as the fiduciary of the respective plans, Provident is entitled to seek restitution under ERISA's civil enforcement provision.

Restitution Under Federal Common Law

107.    Restitution is defined as that "body of law in which (1) substantive liability is based on unjust enrichment, (2) the measure of recovery is based on defendant's gain instead

62

of plaintiff's loss, or (3) the court restores to plaintiff, in kind, his lost property or its proceeds." *Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 747 (D.C. Cir.), *cert. denied*, 516 U.S. 865 (1995); *Cunningham v. Dun & Bradstreet Plan Servs., Inc.*, 889 F. Supp. 932, 935 (N.D. Miss. 1995), *aff'd*, 105 F.3d 665 (5th Cir. 1996). The purpose of restitution is to force a recipient to restore ill-gotten gains. *See Landwehr*, 72 F.3d at 735; *Schwartz v. Gregori*, 45 F.3d 1017, 1022 (6th Cir.), *cert. denied*, 516 U.S. 819 (1995).

> [R]estitution as normally understood in civil cases seeks to deprive the defendant of money or any other thing of value that he gained from tortious or otherwise wrongful activity or that it would be unconscionable for him to retain because received from the plaintiff in circumstances under which he knew or should have known that the plaintiff expected compensation. In either case the defendant would be unjustly enriched if allowed to keep the gain . . . .

*Reich v. Continental Cas. Co.*, 33 F.3d 754, 755 (7th Cir. 1994), *cert. denied*, 513 U.S. 1152 (1995); *Guardian Life Ins. Co. v. Roma*, 895 F. Supp. 442, 448 (N.D.N.Y. 1995), *aff'd*, 101 F.3d 682 (2d Cir. 1996).

108.    To obtain restitution, a plaintiff must demonstrate that the defendant wrongfully secured a benefit, or passively received one, which would be unconscionable for him to retain. *See Geller v. County Line Auto Sales, Inc.*, 86 F.3d 18, 22 (2d Cir. 1996). The court must determine whether it is against equity and good conscience to permit the defendant to retain the enrichment. *See id.* A plaintiff seeking restitution must also show that the equities balance in its favor. *See Alaska Trowel Trades Pension Fund v. Lopshire*, 103 F.3d 881, 885 (9th Cir. 1996); *Brown v. Health Care & Retirement Corp.*, 25 F.3d 90, 94 (2d Cir. 1994); *Frank L. Ciminelli Constr. Co. v. Buffalo Laborers Supplemental Unemployment Ben. Fund*, 976 F.2d 834, 836 (2d Cir. 1992) (internal quotations omitted). In accordance with this principle, restitution will not be permitted when the terms of a plan provide for the payments in question.

63

*See Bollman Hat Co. v. Root*, 112 F.3d 113, 116 (3d Cir.), *cert. denied*, 118 S. Ct. 373 (1997); *Ryan by Capria-Ryan v. Federal Express Corp.*, 78 F.3d 123, 127 (3d Cir. 1996); *Cummings*, 797 F.2d at 390 (citing *Craig v. Bemis Co.*, 517 F.2d 677, 684 (5th Cir. 1975) ("enrichment would not be 'unjust' where it is allowed by the express terms of the Plan")).

109.    A fund will be able to recover mistaken payments, however, even when the fund's own negligence was responsible for the payment and resulting unjust enrichment of the defendant. *See Young Am., Inc. v. Union Cent. Life Ins. Co.*, 101 F.3d 546, 548 (8th Cir. 1996); *Luby v. Teamsters Health, Welfare & Pension Trust Funds*, 944 F.2d 1176, 1186 (3d Cir. 1991); *Waller*, 906 F.2d at 994. "Gratuitous transferees of a trust fund's assets are required to make restitution regardless of their lack of notice or knowledge." *Landwehr*, 72 F.3d at 735; *In re Mahan & Rowsey, Inc.*, 817 F.2d 682, 684 (10th Cir. 1987).

110.    Here, it is undisputed that Burzynski received $24,576.00 for the treatment of Gallagher, $12,773.25 for the treatment of Harvey, and $21,232.50 for the treatment of Carroll. Provisos in the respective plans, however, state that no payments will be made for experimental drugs, illegal drugs, or unusual treatments.

111.    The uncontroverted evidence indicates that Burzynski's treatment with antineoplastons fell within exclusions contained in each of the three plans. It would, therefore, be contrary to general notions of fairness to allow him to retain these benefits.

112.    Furthermore, even if the payments were not contrary to the plans' express terms, it would be unconscionable for him to retain the funds, because the payments compensated Burzynski for treatments found to be unlawful under federal and state law. As a matter of general equity, "there is a strong public policy . . . against reward for illegal activity

64

. . . ." *Kansas City Community Ctr. v. Heritage Indus., Inc.*, 972 F.2d 185, 189 (8th Cir. 1992); *see Hiram Ricker & Sons v. Students Int'l Meditation Soc'y*, 501 F.2d 550, 557 (1st Cir. 1974) (noting the public importance of discouraging prohibited transactions); *In re Sec. Group*, 116 B.R. 839, 844 (M.D. Fla. 1990) (refusing to allow the retention of payments under an illegal contract where this would reward the party for participating in an illegal transaction). "[R]estitution is aimed at returning the plaintiff to her or his status quo prior to the defendant's illegal activity." *Hayden v. McDonald*, 742 F.2d 423, 440 (8th Cir. 1984).

113.    Thus, Burzynski's receipt of these pecuniary benefits resulted in his unjust enrichment.  His continued retention of the funds would be unconscionable and contrary to principles of fairness and equity.  Accordingly, Burzynski must disgorge these payments in order to return Provident to the *status quo ante*.

### Punitive Damages

114.    Provident also seeks an award of punitive damages.  As noted above, Provident may seek only equitable relief under ERISA.  Damages, whether punitive or otherwise, are not a form of equitable relief.  *See In re Unisys Corp. Retiree Med. Ben. ERISA Litig.*, 57 F.3d 1255, 1268-69 (3d Cir. 1995) (holding that "equitable relief under § 1132(a)(3)(B) does not include damages), *cert. denied*, 517 U.S. 1103 (1996); *Howe v. Varity Corp.*, 36 F.3d 746, 752 (8th Cir. 1994); *Novak v. Andersen Corp.*, 962 F.2d 757, 761 (8th Cir. 1992) ("Damages are damages, and an award of damages is a legal, not an equitable, remedy"), *cert. denied*, 508 U.S. 959 (1993).  Therefore, Provident is not entitled to punitive damages under ERISA.  *See Reich v. Rowe*, 20 F.3d 25, 31 (1st Cir. 1994); *Medina v. Anthem Life Ins. Co.*, 983 F.2d 29, 32 (5th Cir.), *cert. denied*, 510 U.S. 816 (1993).

CMPDF - www.fastio.com

115.   Under Texas law, the decision whether to award punitive damages is "within the discretion of the trier of fact." TEX. CIV. PRAC. & REM. CODE ANN. § 41.010(b); *see Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 29 (Tex. 1994).  A finding of unjust enrichment will not support the imposition of punitive damages unless there is proof of fraud, malice, or gross negligence. *See Bransom v. Standard Hardware, Inc.*, 874 S.W.2d 919, 927 (Tex. App.—Fort Worth 1994, writ denied).  No such findings were made here.

116.   In awarding exemplary damages, the trier of fact should consider (1) the nature of the wrong; (2) the frequency of the wrongs committed; (3) the character of the conduct involved; (4) the degree of the wrongdoer's culpability; (5) the situation and sensibilities of the parties involved; (6) the extent to which such conduct offends a sense of public justice and propriety; and (7) the amount needed to deter similar acts in the future. *See Campbell v. Salazar*, 960 S.W.2d 719, 729 (Tex. App.—El Paso 1997, writ denied).

117.   The purpose of awarding punitive damages is to punish the defendant and to deter similar conduct. *See Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 19 (1991); *Estate of Moore v. Commissioner*, 53 F.3d 712, 715 (5th Cir. 1995); *Acosta v. Amoco Oil Co.*, 978 F. Supp. 703, 706 (S.D. Tex. 1997); *Moriel*, 879 S.W.2d at 17.  No plaintiff, however, has a right to punitive damages. *See Acosta*, 978 F. Supp. at 706; *Moriel*, 879 S.W.2d at 17 n.7.

118.   In the instant case, the restitution awarded serves as sufficient punishment for the defendants.  Moreover, the *sui generis* nature of this case makes it unlikely that an award of punitive damages is needed or would deter similar conduct.  Furthermore, the award of attorneys' fees and prejudgment interest is a sufficient deterrent to similar, future conduct.  Additionally, the plan participants voluntarily sought Burzynski's treatment.  As noted above,

some of Burzynski's patients testified that the treatment with antineoplastons improved their condition. Although these participants contributed funds to the plan, Provident will be reimbursed for payments made to Burzynski on their behalf. Finally, although Burzynski's treatment was illegal during the relevant time period, the FDA subsequently approved clinical trials of antineoplastons.

119. In light of these and other factors, punitive damages are not appropriate in this case.

### Declaratory Judgment

120. Provident also seeks a declaration from this court that it has no obligation to pay Burzynski for the treatment with antineoplastons that Burzynski provided to the six patients at issue.

121. The Declaratory Judgment Act provides in relevant part:

In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a).

122. "The purpose of the Declaratory Judgment Act is to settle 'actual controversies' before they ripen into violations of law or breach of some contractual duty." *Chevron U.S.A, Inc. v. Traillour Oil Co.*, 987 F.2d 1138, 1154 (5th Cir. 1993) (quoting *Hardware Mut. Cas. Co. v. Schantz*, 178 F.2d 779, 780 (5th Cir. 1949)); *see also Serco Servs. Co. v. Kelley Co., Inc.*, 51 F.3d 1037, 1039 (Fed. Cir. 1995); *Presbytery of New Jersey v. Florio*, 40 F.3d 1454, 1464 (3d Cir. 1994), *cert. denied*, 117 S. Ct. 1334 (1997). Stated

CHMPDF - www.fasoo.com

differently, the Act exists "'to relieve potential defendants from the Damoclean threat of impending litigation which a harassing adversary might brandish, while initiating suit at his leisure—or never.'" *Spokane Indian Tribe v. United States*, 972 F.2d 1090, 1091-92 (9th Cir. 1992) (quoting *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 (9th Cir. 1989) (quoting *Societe de Conditionnement en Aluminium v. Hunter Eng'g Co. Inc.*, 655 F.2d 938, 943 (9th Cir. 1981))).

123.    "The Declaratory Judgment Act merely 'enables a party to achieve federal question jurisdiction over a suit to declare that a claim arising under federal law which another asserts against him is not valid.'" *Gaar v. Quirk*, 86 F.3d 451, 453 (5th Cir. 1996) (quoting *Lowe v. Ingalls Shipbuilding*, 723 F.2d 1173, 1179 (5th Cir. 1984)).  The Declaratory Judgment Act allows "'relief to be given by way of recognizing the plaintiff's right even though no immediate enforcement of it was asked.'" *Textron Lycoming Reciprocating Engine Div. v. United Auto., Aerospace & Agric. Implement Workers of Am. Int'l Union*, 118 S. Ct. 1626, 1630 n.3 (1998) (quoting *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671-72 (1950)).

124.    "It is well established in this circuit that a court need not provide declaratory judgment relief on request, as this is a matter left to the district court's sound discretion." *Odeco Oil & Gas Co., Drilling Div. v. Bonnette*, 4 F.3d 401, 404 (5th Cir. 1993), *cert. denied*, 511 U.S. 1004 (1994); *see also Wilton v. Seven Falls Co.*, 515 U.S. 277, 281 (1995); *Brillhart v. Excess Ins. Co.*, 316 U.S. 491, 494 (1942).  This discretion, however, is qualified by the proviso that a court must have a sufficient reason for declining to grant a declaratory judgment. *See American States Ins. Co. v. Bailey*, 133 F.3d 363, 368 (5th Cir.

1998); *St. Paul Ins. Co. v. Trejo*, 39 F.3d 585, 590 (5th Cir. 1994); *Mission Ins. Co. v. Puritan Fashions Corp.*, 706 F.2d 599, 601 (5th Cir. 1983).

       125.    In determining whether to grant a declaratory judgment, a court must act in accordance with the purposes of the Declaratory Judgment Act and the principles of sound judicial administration. *See EMC Corp. v. Norand Corp.*, 89 F.3d 807, 813-14 (Fed. Cir. 1996), *cert. denied*, 117 S. Ct. 789 (1997); *Trejo*, 39 F.3d at 590; *Travelers Ins. Co. v. Louisiana Farm Bureau Fed'n*, 996 F.2d 774, 778 (5th Cir. 1993).

       126.    Under the Act, no declaratory judgment may issue unless there exists an "actual controversy." *See Bailey*, 133 F.3d at 368; *Middle South Energy, Inc. v. City of New Orleans*, 800 F.2d 488, 490 (5th Cir. 1986) (citing *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). The meaning of "actual controversy" for purposes of a declaratory judgment is identical to the meaning of "case or controversy" under Article III of the United States Constitution. *See Lawson v. Callahan*, 111 F.3d 403, 405 (5th Cir. 1997); *Texas v. West Publ'g Co.*, 882 F.2d 171, 175 (5th Cir. 1989), *cert. denied*, 493 U.S. 1058 (1990); *Windsurfing Int'l Inc. v. AMF, Inc.*, 828 F.2d 755, 757 (Fed. Cir. 1987). Thus, a plaintiff must demonstrate "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual and imminent.'" *Nevares v. San Marcos Consol. Indep. Sch. Dist.*, 111 F.3d 25, 26 (5th Cir. 1997) (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, ___, 117 S. Ct. 1055, 1067 (1997) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992))). Accordingly, a plaintiff seeking a declaratory judgment must show that there is "'a reasonable apprehension of facing a lawsuit.'" *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1073 (D.C. Cir. 1998) (quoting *Federal Express Corp. v. Air Line Pilots Ass'n*, 67 F.3d

961, 964 (D.C. Cir. 1995)); *see Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 122 (1974)

(controversy must have "sufficient immediacy and reality"); *Evans Med. Ltd. v. American*

*Cyanamid Co.*, 980 F. Supp. 132, 135 (S.D.N.Y. 1997) (threat of litigation must be immediate

and real).

      127.    In the present instance, Provident has demonstrated that there is an actual

controversy concerning whether it is liable to pay for Burzynski's treatment of the six patients.

The fact that Burzynski seeks payment for additional treatment provided to McKeeby confirms

this.  There is a sufficient threat of litigation concerning this issue.

      128.    As to Gallagher, although Provident has not been her medical carrier since

the latter part of 1994, Provident's reasonable apprehension of another lawsuit by Gallagher

warrants a declaration that Provident is not liable to pay for Burzynski's treatment.

      129.    As to the four other patients, Provident has not demonstrated that there is

a reasonable apprehension of facing a future lawsuit, as Hadley, Medow, Harvey, and Carroll

are all deceased and the statutes of limitations have expired.

      130.    Because it was unlawful under both federal and state law for Burzynski to

distribute antineoplastons to his patients, it is proper to issue a declaration that Provident has no

obligation or duty to Burzynski or BRI to pay for any treatment of McKeeby or Gallagher

related to the administration of antineoplastons.

    Attorneys' Fees and Costs

      131.    Provident seeks an award of attorneys' fees and court costs under Texas

law and ERISA.

70

132.    ERISA provides that "[i]n any action under this subchapter . . . by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party."  29 U.S.C. § 1132(g)(1); *see Russell*, 473 U.S. at 147; *Sunbeam-Oster Co., Inc. Group Benefits Plan v. Whitehurst*, 102 F.3d 1368, 1378 (5th Cir. 1996).

133.    The determination of attorneys' fees requires a two-step analysis.  *See Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Mich.*, 97 F.3d 822, 833 (5th Cir. 1996); *Todd*, 47 F.3d at 1459.  First, the court must apply five enumerated factors to determine whether attorneys' fees are warranted under the particular facts of the case.  *See Wegner*, 129 F.3d at 821; *Izzarelli v. Rexene Prods. Co.*, 24 F.3d 1506, 1525 n.35 (5th Cir. 1994).  These factors are:  (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the party requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions.  *See Wegner*, 129 F.3d at 821; *Ramsey v. Colonial Life Ins. Co.*, 12 F.3d 472, 480 n.7 (5th Cir. 1994); *Pitts*, 931 F.2d at 358.  Other considerations, such as the quality of the representation, might also be relevant to the determination.  *See Cottrill v. Sparrow*, 100 F.3d 220, 225 (1st Cir. 1996); *Anthius v. Colt Indus. Operating Corp.*, 971 F.2d 999, 1012 (3d Cir. 1992).  No single factor is necessarily decisive, and some may not be apropos in a given case, but together they are the nuclei of concerns that a court must address in applying the relevant costs and attorneys' fees provision of ERISA.  *See Wegner*, 129 F.3d

71

ClibPDF - www.fastio.com

at 821; *Izzarelli*, 24 F.3d at 1525 n.35. Ultimately, the award of attorneys' fees and costs is discretionary. *See Cottrill*, 100 F.3d at 225; *Canseco v. Construction Laborers Pension Trust*, 93 F.3d 600, 609 (9th Cir. 1996), *cert. denied*, 117 S. Ct. 1250 (1997).

134. "If the court determines that a party is entitled to attorneys' fees, it must then apply the lodestar calculation to determine the amount to be awarded." *Todd*, 47 F.3d at 1459. This calculation entails multiplying the number of hours expended on the matters at issue in the case by a reasonable hourly rate. *See id.*; *Casey v. City of Cabool*, 12 F.3d 799, 805 (8th Cir. 1993), *cert. denied*, 513 U.S. 932 (1994); *Loranger v. Stierheim*, 3 F.3d 356, 362 (11th Cir. 1993).

135. In the instant case, Burzynski engaged in misrepresentations with respect to billing Provident for treatment with antineoplastons. Further, Burzynski knew that his treatment was illegal, yet he continued to provide antineoplastons to his patients. Thus, Burzynski acted in bad faith.

136. As to the deterrent effect of attorneys' fees, this court finds that such an award would provide an additional deterrent to similar conduct on the part of Burzynski and others.

137. With respect to the relative merits of the parties' positions, it has been shown that Burzynski's treatment had been declared unlawful and that there was no basis for his receipt of the payments.

138. Accordingly, after considering all of these factors, the court finds that an award of attorneys' fees and costs under ERISA is warranted under the particular facts of this case.

139.    As to attorneys' fees for the state law claims, the Fifth Circuit has held that state law governs this question. *See Ashland Chem. Inc. v. Barco Inc.*, 123 F.3d 261, 263 (5th Cir. 1997); *Exxon Corp. v. Burglin*, 4 F.3d 1294, 1302 (5th Cir. 1993); *Fuchs v. Lifetime Doors, Inc.*, 939 F.2d 1275, 1280 (5th Cir. 1991); *McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1487 (5th Cir. 1990).

140.    Texas follows the "American Rule" which imposes the burden of attorneys' fees on the individual litigants. *See Ashland Chem. Inc.*, 123 F.3d at 263; *Crenshaw*, 940 F.2d at 129; *Ganz v. Lyons Partnership*, 173 F.R.D. 173, 175 (N.D. Tex. 1997); *Turner v. Turner*, 385 S.W.2d 230, 233 (Tex. 1964); *Amoco Prod. Co.*, 946 S.W.2d at 165; *Base-Seal, Inc. v. Jefferson County*, 901 S.W.2d 783, 785 (Tex. App.—Beaumont 1995, writ denied).

141.    This rule has been abrogated slightly in that attorneys' fees are recoverable when provided for by statute or contract between the parties. *See Bank One, Tex., N.A. v. Taylor*, 970 F.2d 16, 35 (5th Cir. 1992); *Richter v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 939 F.2d 1176, 195 (5th Cir. 1991); *Texas Commerce Bank Nat'l Ass'n v. Capital Bancshares, Inc.*, 907 F.2d 1571, 1575 (5th Cir. 1990); *Schlobohm v. Pepperidge Farm, Inc.*, 806 F.2d 578, 583 (5th Cir. 1987). "The authorization of attorney's fees in civil cases may not be inferred; rather it 'must be provided for by the express terms of the statute in question.'" *Travelers Indem. Co. v. Mayfield*, 923 S.W.2d 590, 593 (Tex. 1996) (quoting *First City Bank v. Guex*, 677 S.W.2d 25, 30 (Tex. 1984)); *see Comi v. DSC Fin. Corp.*, 994 F. Supp. 121, 126 (N.D.N.Y. 1998); *Knebel v. Capital Nat'l Bank*, 518 S.W.2d 795, 803 (Tex. 1974); *New Amsterdam Cas. Co. v. Texas Indus., Inc.*, 414 S.W.2d 914, 915 (Tex. 1967).

73

142. Provident has not advanced any Texas statute in support of its claim for attorneys' fees. Further, "TEX. CIV. PRAC. & REM. CODE ANN. § 38.001 lists those claims upon which an attorney's fee award may be predicated." *Amoco Prod. Co.*, 946 S.W.2d at 165-66. It does not, however, designate unjust enrichment or restitution claims as a basis for an award of attorneys' fees. *See id.*

143. Accordingly, Provident is entitled to an award of attorneys' fees under ERISA but not under state law.

<u>Prejudgment Interest</u>

144. Provident also seeks an award of prejudgment interest.

145. Where a cause of action arises under a federal statute, federal law governs the scope of the remedy, including whether prejudgment interest is allowed. *See F.D. Rich, Inc. v. United States ex rel. Indus. Lumber Co.*, 417 U.S. 116, 127 (1974); *Carpenters Dist. Council v. Dillard Dept. Stores, Inc.*, 15 F.3d 1275, 1288 (5th Cir. 1994), *cert. denied*, 513 U.S. 1126 (1995); *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 983 (5th Cir. 1991); *United States ex rel. Georgia Elec. Supply v. United States Fid. & Guar. Co.*, 656 F.2d 993, 997 (5th Cir. 1981); *In re Arbitration Between: Trans Chem. Ltd. & China Nat'l Mach. Import & Export Corp.*, 978 F. Supp. 266, 312 (S.D. Tex. 1997).

146. ERISA does not preclude an award of prejudgment interest. *See Hansen*, 940 F.2d at 984 n.11. Rather, an award of prejudgment interest is entrusted to the sound discretion of the trial court. *See Cottrill*, 100 F.3d at 223; *In re Tex. Gen. Petroleum Corp.*, 52 F.3d 1330, 1339 (5th Cir. 1995); *Tiemeyer v. Community Mut. Ins. Co.*, 8 F.3d 1094, 1102 (6th Cir.), *cert. denied*, 511 U.S. 1005 (1994); *Transitional Learning Community v.*

74

ClickPDF - www.fineto.com

*Metropolitan Life Ins. Co.*, 913 F. Supp. 504, 508 (S.D. Tex. 1996). Such an award is appropriate when it furthers the congressional policies of the specific statute and encourages parties to settle disputes "quickly and fairly, thereby avoiding the expense and difficulty of federal litigation." *Hansen*, 940 F.2d at 984 n.11; *see Gore v. Glickman*, 137 F.3d 863, 866 (5th Cir. 1998); *Guidry v. Booker Drilling Co.*, 901 F.2d 485, 488 (5th Cir. 1990); *Transitional Learning Community*, 913 F. Supp. at 508. In exercising its discretion, the trial court should balance the relative equities between the parties. *See Gore*, 137 F.3d at 866; *Landwehr*, 72 F.3d at 739. Further, "it is appropriate for the district court to look to state law for guidance in determining the rate of interest." *Hansen*, 940 F.2d at 984.

147. In the present case, an award of prejudgment interest would further the congressional policies of ERISA and encourage similarly-situated litigants to avoid the expense and difficulty of a federal lawsuit.

148. The current federal postjudgment interest rate, 5.375 percent, is an appropriate rate of prejudgment interest for the restitution awarded on the ERISA claims.

149. Provident is entitled to prejudgment interest as to the amounts paid to Burzynski on behalf of Carroll and Harvey as of the commencement of this lawsuit: December 5, 1995.

150. As to Gallagher, Provident sent Burzynski a letter dated February 21, 1995, informing him that Gallagher's claims were improperly paid and seeking repayment. Therefore, Provident is entitled to prejudgment interest as to the amounts paid on behalf of Gallagher as of August 21, 1995, 180 days after the demand for payment. This comports with

Case 4:95-cv-05480 Document 68 Filed in TXSD on 08/07/98 Page 76 of 89

Texas law concerning the accrual date for prejudgment interest. *See Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 531 (Tex. 1997).

151. As to Provident's unjust enrichment claim, Texas law governs the award of prejudgment interest in diversity cases. *See Mitchell Energy Corp.*, 80 F.3d at 986; *Harris v. Mickel*, 15 F.3d 428, 429 (5th Cir. 1994); *Travelers Ins. Co. v. Liljeberg Enter., Inc.*, 7 F.3d 1203, 1209 (5th Cir. 1993); *Teate v. Mutual Life Ins. Co.*, 965 F. Supp. 891, 894 (E.D. Tex. 1997); *Great Pines Water Co. v. Liqui-Box Corp.*, 962 F. Supp. 990, 991 (S.D. Tex. 1997).

152. "Prejudgment interest is 'compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment.'" *Johnson & Higgins*, 962 S.W.2d at 528 (quoting *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 552 (Tex. 1985)).

153. "'Under Texas law an equitable award of prejudgment interest should be granted to a prevailing plaintiff in all but exceptional circumstances.'" *See Bituminous Cas. Corp. v. Vacuum Tanks, Inc.*, 75 F.3d 1048, 1057 (5th Cir. 1996) (quoting *American Int'l Trading Corp. v. Petroleos Mexicanos*, 835 F.2d 536, 541 (5th Cir. 1987)); *see also Executone Info. Sys., Inc. v. Davis*, 26 F.3d 1314, 1329 (5th Cir. 1994) (citing *Cavnar*, 696 S.W.2d at 552); *Richter*, 939 F.2d at 1197.

154. There are two sources for an award of prejudgment interest: (1) general principles of equity and (2) an enabling statute. *See Johnson & Higgins*, 962 S.W.2d at 528; *Cavnar*, 696 S.W.2d at 552; *Phillips Petroleum Co. v. Stahl Petroleum Co.*, 569 S.W.2d 480, 483-85 (Tex. 1978). As "statutory prejudgment interest applies only to wrongful death, personal

CMPDF - www.fasoo.com

injury, and property damages cases," it is not applicable here. *Johnson & Higgins*, 962 S.W.2d at 530.

155.    Common law prejudgment interest begins to accrue on the earlier of (1) 180 days after the date a defendant receives written notice of a claim or (2) the date suit is filed. *See Johnson & Higgins*, 962 S.W.2d at 531; *Chang v. Chen Huang*, No. 01-97-00538-CV, 1998 WL 224041, at *1 (Tex. App.—Houston [1st Dist.] May 1, 1998, no writ). Equitable prejudgment interest is computed as simple interest, compounded annually, at the rate for postjudgment interest. *See Johnson & Higgins*, 962 S.W.2d at 532; *Southeastern Pipe Line Co., Inc. v. Tichacek*, No. 13-96-196-CV, 1998 WL 306485, at *10 (Tex. App.—Corpus Christi June 11, 1998, no writ).

156.    Prejudgment interest accrues at the rate for postjudgment interest and is computed as simple interest. *See Johnson & Higgins*, 962 S.W.2d at 532. Here, the rate for postjudgment interest is 5.375 percent.

157.    In this instance, Provident has not presented evidence that Burzynski or BRI received written notice of its claims concerning Medow or McKeeby. As to Hadley, Provident demonstrated that it sent a letter to Burzynski around December 13, 1993, in which it requested that Burzynski return $130, "because this type of treatment has not been FDA approved and is considered experimental at this time." Accordingly, Provident is entitled to prejudgment interest at the rate of 5.375 percent as to the amounts paid to Burzynski on behalf of Hadley from June 13, 1994, 180 days after written demand, and on behalf of Medow and McKeeby as of the commencement of the lawsuit on December 5, 1995. Interest accrues at the rate of 5.375 percent.

CVtPDF - www.fastio.com

<u>Postjudgment Interest</u>

158.    Provident also seeks postjudgment interest on the damage award.

159.    Federal law provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in district court." 28 U.S.C. § 1961(a). This provision governs money judgments based on federal or state law. *See Mitchell Energy Corp.*, 80 F.3d at 987; *Liljeberg Enter., Inc.*, 7 F.3d at 1209; *Brown v. Petrolite Corp.*, 965 F.2d 38, 51 (5th Cir. 1992); *Fuchs*, 939 F.2d at 1280. An award of postjudgment interest under this provision is mandatory. *See Bancamerica Commercial Corp. v. Mosher Steel of Kan., Inc.*, 103 F.3d 80, 81 (10th Cir. 1996); *Lewis v. Whelan*, 99 F.3d 542, 545 (2d Cir. 1996); *Reeves v. International Tel. & Tel. Corp.*, 705 F.2d 750, 752 (5th Cir. 1983); *Transitional Learning Community*, 913 F. Supp. at 509. Thus, postjudgment interest will be awarded on the entire damage award from August 7, 1998, at 5.375 percent. *See* 9 U.S.C. § 14; *see also Mitchell Energy Corp.*, 80 F.3d at 987; *Mantle v. Upper Deck Co.*, 956 F. Supp. 719, 739 (N.D. Tex. 1997); *Transitional Learning Community*, 913 F. Supp. at 509.

<u>Piercing the Corporate Veil</u>

160.    Provident seeks to pierce the corporate veil of BRI to hold it liable for the monetary awards in this case. Provident alleges that Burzynski and BRI are alter egos so that BRI should share Burzynski's liability.

161.    Texas courts have been reluctant to pierce the corporate veil except in extraordinary circumstances. *See Matter of Earl Sims*, 994 F.2d 210, 218 (5th Cir. 1993), *cert. denied*, 510 U.S. 1049 (1994); *Villar v. Crowley Maritime Corp.*, 990 F.2d 1489, 1497 (5th Cir. 1993), *cert. denied*, 510 U.S. 1044 (1994); *Edwards Co., Inc. v. Monogram Indus., Inc.*, 730

78

F.2d 977, 980-81 (5th Cir. 1984); *Kasprzak v. American Gen. Life & Accident Ins. Co.*, 914 F. Supp. 144, 146 (E.D. Tex. 1996); *Mancorp, Inc. v. Culpepper*, 836 S.W.2d 844, 847 (Tex. App.—Houston [1st Dist.] 1992, no writ).

162. Nevertheless, "Texas courts will 'pierce the corporate veil' to prevent fraud or to achieve equity. In particular, courts will disregard the corporate fiction when individuals exploit the corporate form as a sham to perpetrate a fraud." *Sid Richardson Carbon & Gasoline Co. v. Interenergy Resources, Ltd.*, 99 F.3d 746, 752 (5th Cir. 1996); *see Capital Parks, Inc. v. Southeastern Adver. & Sales Sys., Inc.*, 30 F.3d 627, 629 (5th Cir. 1994); *Western Horizontal Drilling, Inc. v. Jonnet Energy Corp.*, 11 F.3d 65, 67 (5th Cir. 1994); *Villar*, 990 F.2d at 1496; *Fidelity & Deposit Co. v. Commercial Cas. Consultants, Inc.*, 976 F.2d 272, 274-75 (5th Cir. 1992).

163. The Texas Supreme Court has stated that there are six situations in which courts may pierce the corporate veil: (1) when the fiction is used as a means of perpetrating a fraud; (2) where a corporation is organized and operated as a mere tool or business conduit of another corporation; (3) where the corporate fiction is resorted to as a means of evading an existing legal obligation; (4) where the corporate fiction is employed to achieve or perpetrate monopoly; (5) where the corporate fiction is used to circumvent a statute; and (6) where the corporate fiction is relied upon as a protection of crime or to justify wrong. *See Castleberry v. Branscum*, 721 S.W.2d 270, 271 (Tex. 1986); *see also Western Horizontal Drilling*, 11 F.3d at 67; *Zahra Spiritual Trust v. United States*, 910 F.2d 240, 243 (5th Cir. 1990); *Gibraltar Sav.*, 860 F.2d at 1286-87; *Kasprzak,* 914 F. Supp. at 146.

79

CMPDF - www.fastio.com

164.    The Fifth Circuit has distilled these six situations into three general theories for piercing the corporate veil:   (1) when the corporation is the alter ego of its shareholders or owners; (2) when the corporation is used for illegal purposes; or (3) when the corporation is used as a sham to perpetrate a fraud.  *See Western Horizontal Drilling, Inc.*, 11 F.3d at 67; *see also Capital Parks, Inc.*, 30 F.3d at 629; *Villar*, 990 F.2d at 1496; *Fidelity & Deposit Co.*, 976 F.2d at 274-75; *NorDar Holdings, Inc. v. Western Sec. Ltd.*, 969 F. Supp. 420, 422 (N.D. Tex. 1997).

165.    Traditionally, to pierce the corporate veil, a plaintiff had to prove only constructive fraud or that the corporation was merely a sham to perpetrate a fraud.  *See Castleberry*, 721 S.W.2d at 273; *see also Permian Petroleum Co. v. Petroleos Mexicanos*, 934 F.2d 635, 644 (5th Cir. 1991); *Edwards Co., Inc.*, 730 F.2d at 983-84; *NorDar Holdings, Inc.*, 969 F. Supp. at 422; *Farr v. Sun World Sav. Ass'n*, 810 S.W.2d 294, 296 (Tex. App.—El Paso 1991, no writ).

166.    Following a 1989 amendment to the Texas Business Corporation Act ("TBCA"), a plaintiff seeking to recover under the theory of "sham to perpetrate a fraud" had to "prove that the defendant-shareholder caused the corporation to perpetrate an actual fraud on the obligee for the direct, personal benefit of the shareholder." *NorDar Holdings, Inc.*, 969 F. Supp. at 422; *accord Sid Richardson Carbon & Gasoline Co.*, 99 F.3d at 752; *Thrift v. Estate of Hubbard*, 44 F.3d 348, 353 (5th Cir. 1995); *Farr*, 810 S.W.2d at 296; *see* TEX. BUS. CORP. ACT ANN.  art. 2.21.  In 1991, the TBCA was again amended by the Texas Legislature to provide that a plaintiff must prove actual fraud in order to pierce the corporation on the alter ego theory or other similar theory.  *See Thrift*, 44 F.3d at 354; *Western Horizontal Drilling*, 11 F.3d

80

Case 4:95-cv-05480 Document 68 Filed in TXSD on 08/07/98 Page 81 of 89

at 68 & n.4 (5th Cir. 1994); *Fidelity Deposit Co.*, 976 F.2d at 274; *NorDar Holdings, Inc.*, 969

F. Supp. at 423; *Huff v. Harrell*, 941 S.W.2d 230, 237 (Tex. App.—Corpus Christi 1996, writ

denied).

    167.   The relevant section of the TBCA as currently amended states:

A holder of shares, an owner of any beneficial interest in shares, or a subscriber for shares whose subscription has been accepted, or any affiliate thereof or of the corporation, shall be under no obligation to the corporation or to its obligees with respect to:

*    *    *

(2)  any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the holder, owner, subscriber, or affiliate is or was the alter ego of the corporation, or on the basis of actual fraud or constructive fraud, a sham to perpetrate a fraud, or other similar theory, unless the obligee demonstrates that the holder, owner, subscriber, or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, owner, subscriber, or affiliate.

TEX. BUS. CORP. ACT ANN. art. 2.21(A)(2).

    168.   Piercing the corporate veil is an equitable doctrine that requires a fact-specific approach. *See Villar*, 990 F.2d at 1497; *Permian Petroleum Co.*, 934 F.2d at 644; *In re Petition of Schimmelpenninck*, No. 3:97-CV-2650, 1998 WL 185522, at *7 (N.D. Tex. Apr. 15, 1998); *Castleberry*, 721 S.W.2d at 273.

    169.   Further, the "basis for disregarding the corporate fiction . . . is an independent ground of recovery that must be specifically pleaded or waived." *Villanueva v. Astroworld, Inc.*, 866 S.W.2d 690, 695 (Tex. App.—Houston [1st Dist.] 1993, writ denied) (citing *Mapco, Inc. v. Carter*, 817 S.W.2d 686, 688 (Tex. 1991)); *see Quinn v. Workforce 2000*, 887 F. Supp. 131, 135 (E.D. Tex. 1995); *Castleberry*, 721 S.W.2d at 275 n.5. The burden of

81

proof rests on the party seeking to pierce the corporate veil and "the corporation's separate existence will be given effect unless there are circumstances justifying disregard of the corporate entity." *Edwards Co., Inc.*, 700 F.2d at 999-1000; *see also Sid Richardson Carbon & Gasoline Co.*, 99 F.3d at 752; *Smith v. Dainichi Kinzoku Kogyo Co., Ltd.*, 680 F. Supp. 847, 854 (W.D. Tex. 1988); *Dernick v. Bralorne Resources Ltd.*, 84 F.R.D. 92, 93-94 (S.D. Tex. 1979); *Lucas v. Texas Indus., Inc.*, 696 S.W.2d 372, 374 (Tex. 1984).

170.    Courts are more stringent in their treatment of contract than tort cases when disregarding the corporate entity "because in contract cases the plaintiff has an opportunity to select the entity with which he deals as opposed to tort cases in which no such choice exists." *Mancorp*, 836 S.W.2d at 847; *see Edwards Co., Inc.*, 730 F.2d at 981; *Lucas*, 696 S.W.2d at 375; *Gentry v. Credit Plan Corp.*, 528 S.W.2d 571, 573 (Tex. 1975); *Hickman v. Rawls*, 638 S.W.2d 100, 102 (Tex. App.—Dallas 1982, writ ref'd n.r.e.).

171.    "It has long been the rule in Texas that corporate agents are individually liable for fraudulent or tortious acts committed while in the service of their corporation." *Holberg v. Teal Constr. Co.*, 879 S.W.2d 358, 360 (Tex. App.—Houston [14th Dist.] 1994, no writ) (citing *Guilbeau v. Anderson*, 841 S.W.2d 517, 519 (Tex. App.—Houston [14th Dist.] 1992, no writ)). Therefore, "[i]t is not necessary that the 'corporate veil' be pierced in order to impose personal liability, as long as it is shown that the corporate officer knowingly participated in the wrongdoing." *Commercial Escrow Co. v. Rockport Rebel, Inc.*, 778 S.W.2d 532, 541 (Tex. App.—Corpus Christi 1989, writ denied); *see also Guilbeau v. Anderson*, 841 S.W.2d at 519; *Dorchester Gas Producing Co. v. Harlow Corp.*, 743 S.W.2d 243, 258 (Tex. App.—Amarillo 1987, writ dism'd).

172.    The process of holding a corporation liable for an individual's actions is known as "reverse piercing" and is recognized in Texas. *See Permian Petroleum Co.*, 934 F.2d at 643; *Zahra Spiritual Trust*, 910 F.2d at 243-44; *In re Faith Missionary Baptist Church*, 174 B.R. 454, 466 (E.D. Tex. 1994). "The ultimate goal in a reverse piercing case is unique; rather than merely disregarding the corporate fiction and holding the shareholders accountable, the court treats the individual and the corporation as 'one and the same.'" *Zahra Spiritual Trust*, 910 F.2d at 243.

173.    The Fifth Circuit has developed a list of factors to determine if a subsidiary is the alter ego of the parent: (1) the parent and the subsidiary have common stock ownership; (2) the parent and subsidiary have common directors or officers; (3) the parent and subsidiary have common business departments; (4) the parent and the subsidiary file consolidated financial statements and tax returns; (5) the parent finances the subsidiary; (6) the parent caused the incorporation of the subsidiary; (7) the subsidiary operates with grossly inadequate capital; (8) the parent pays the salaries and other expenses of the subsidiary; (9) the subsidiary receives no business except that given to it by the parent; (10) the parent uses the subsidiary's property as its own; (11) the daily operations of the two corporations are not kept separate; and (12) the subsidiary does not observe the basic corporate formalities such as keeping separate books and records and holding shareholder and board meetings.[1]  *See Gundle Lining Constr. Corp. v. Adams County Asphalt, Inc.*, 85 F.3d 201, 208-09 n.3 (5th Cir. 1996); *Western Horizontal Drilling, Inc.*, 11 F.3d at 67; *Century Hotels v. United States*, 952 F.2d 107, 109-10 (5th Cir.

---

[1]  The 1989 amendment to the Business Corporation Act removed "failure to observe corporate formalities" from the list. *See Western Horizontal Drilling, Inc.*, 11 F.3d at 68.

83

1992); *Gibraltar Sav.*, 860 F.2d at 1291-92; *United States v. Jon-T Chemicals, Inc.*, 768 F.2d 686, 691-92 (5th Cir. 1985), *cert. denied*, 475 U.S. 1014 (1986).

174.    The Fifth Circuit has approved application of these factors to situations where it is asserted that an individual is an alter ego of a corporation. *See Gundle Lining Constr. Corp.*, 85 F.3d at 208 n.3; *Century Hotels*, 952 F.2d at 110.

175.    In addition to these factors, the "courts will examine the total dealings of the corporation and the individual, the amount of financial interest the individual has in the corporation; the ownership and the control that the individual maintains over the corporation, and whether the corporation has been used for personal purposes." *Gundle Lining Constr. Corp.*, 85 F.3d at 209; *see Western Horizontal Drilling, Inc.*, 11 F.3d at 68; *Harrell v. DCS Equip. Leasing Corp.*, 951 F.2d 1453, 1458-59 (5th Cir. 1992); *Permian Petroleum Co.*, 934 F.2d at 642; *Zahra Spiritual Trust*, 910 F.2d at 245.

176.    Texas courts have held "that one-hundred percent ownership and identity of directors and officers are, even together, an insufficient basis for applying alter ego theory to pierce the corporate veil." *In the Matter of Earl Sims*, 994 F.2d at 218 (quoting *Jon-T Chemicals, Inc.*, 768 F.2d at 691); *see Dalton v. R & W Marine, Inc.*, 897 F.2d 1359, 1363 (5th Cir. 1990); *Nelson v. International Paint Co., Inc.*, 734 F.2d 1084, 1091-93 (5th Cir. 1984); *Edwards Co.*, 730 F.2d at 980-82; *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1162 (5th Cir. 1983).

177.    In the present case, BRI is a publicly held corporation in which Burzynski owns "about 80 percent" of BRI's stock. The other 20 percent of BRI's stock is owned by

about 2,000 stockholders. Burzynski's wife, children, and brother own less than 1/10 of a percent of the shares.

178.    Burzynski is the president of BRI and serves as the chairman of BRI's board of directors. His wife and brother are also members of the board. Hayzuld, a physician at the Baylor College of Medicine, and Driscoll, an attorney, also serve on the board.

179.    Although the clinic and BRI shared four employees, BRI and Burzynski did not share common business departments. Further, the evidence indicates that Burzynski's clinic continues to keep the businesses separate by not allowing BRI to receive any money from services relating to patients. There is no evidence that consolidated financial statements were prepared or that consolidated tax returns were filed.

180.    Moreover, there is no evidence that BRI operates with grossly inadequate capital.

181.    The clinic occasionally uses BRI's equipment and pays a rental fee to BRI for this use.

182.    Considering the totality of the evidence, Provident has not met its burden to demonstrate that BRI is the alter ego of Burzynski. Therefore, BRI cannot be held responsible for judgments against Burzynski personally, but it is liable for any payments made directly to it, which are recoverable according to the principles of restitution discussed above.

Burzynski's Counterclaim

183.    By way of a counterclaim, Burzynski seeks recovery from Provident for the additional treatment provided to McKeeby from approximately December 1991 to August 1996.

85

184. "Parties have a right to contract as they see fit as long as the contract does not contravene public policy and their contracts are not illegal." *Twelve Oaks Tower I, Ltd. v. Premier Allergy, Inc.*, 938 S.W.2d 102, 118 (Tex. App.—Houston [14th Dist.] 1997, no writ); *see Benbow v. Boney*, 240 S.W.2d 438, 441 (Tex. Civ. App.—Waco 1951, writ ref'd). Courts, however, will not enforce illegal contracts. *See Robles v. Consolidated Graphics, Inc.*, 965 S.W.2d 552, 561 (Tex. App.—Houston [14th Dist.] 1997, no writ); *Texas Life, Accident, Health & Hosp. Serv. Ins. Guar. Ass'n v. Lorena State Bank*, 911 S.W.2d 842, 844 (Tex. App.—Austin 1995, writ denied).

185. "A contract which is made in violation of a statute is illegal and void." *Vitapro Foods, Inc.*, 1998 WL 175603, at *4; *see Flynn Bros., Inc. v. First Med. Assoc.*, 715 S.W.2d 782, 785 (Tex. App.—Dallas 1986, writ ref'd n.r.e.) (contract in violation of Texas Medical Practices Act is illegal and unenforceable); *Mayfield v. Troutman*, 613 S.W.2d 339, 344 (Tex. Civ. App.—Tyler 1981, writ ref'd n.r.e.). "Where part of the consideration is illegal because it violates the law, the entire agreement is void if the contract is entire and indivisible." *Montgomery v. Browder*, 930 S.W.2d 772, 778 (Tex. App.—Amarillo 1996, writ denied); *see David Gavin Co. v. Gibson*, 780 S.W.2d 833, 835 (Tex. App.—Houston [14th Dist.] 1989, writ denied). This rule is operative even if the parties were ignorant of the contract's illegality. *See Plumlee v. Paddock*, 832 S.W.2d 757, 759 (Tex. App.—Fort Worth 1992, writ denied).

186. In a similar fashion, courts will not enforce contracts that are against public policy. *See Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.*, 793 S.W.2d 660, 664-65 (Tex. 1990); *Baron v. Mullinax, Wells, Mauzy & Baab, Inc.*, 623 S.W.2d 457, 461 (Tex. App.—Texarkana 1981, writ ref'd n.r.e.). "Although a contract may not be contrary to public

86

policy on its face, a trial court may look at the agreement's underlying facts to determine whether the agreement was injurious to the public good and contrary to public policy." *Johnson v. McLeaish*, No. 05-01673-CV, 1995 WL 500308, at *3 (Tex. App.—Dallas 1995, writ denied).

187.    Burzynski's sole basis for recovery from Provident involves his treatment of McKeeby with antineoplastons and ancillary services.  As explained above, Burzynski's treatment with antineoplastons was unlawful under both federal and state law.  Accordingly, Provident has no obligation to pay for this treatment.  Requiring Provident to pay for treatment that was illegal at the time performed would compensate Burzynski for performing illegal acts. Allowing Burzynski to recover under these circumstances would only encourage Burzynski and others to commit similar unlawful acts.  Thus, enforcement of any obligation that Provident had to Burzynski by virtue of his treatment of McKeeby would be contrary to sound public policy.

188.    Even if the treatment were not illegal, the terms of McKeeby's plan also dictate that Burzynski is not entitled to compensation for the treatment.

189.    As discussed above, Provident's policy with McKeeby only provides coverage for "medical services and supplies generally furnished for cases of comparable nature and severity in the particular geographical area concerned."

190.    Burzynski's testimony clearly confirmed that his form of treatment is unusual and is not generally furnished in this geographic area.  Price's testimony confirmed this. Therefore, Burzynski has not shown that his treatment is covered under the terms of the policy.

191.    As the Fifth Circuit observed in *Northwest Laundry*:

Dr. Burzynski's antineoplastons treatment had not been approved by the FDA, nor by the Texas Department of Health, and was not in accordance with accepted

> medical standards. Accordingly, the treatments were not "medically necessary" as the Plan defines the term.

27 F.3d at 156-57 (footnote omitted).

192.    Therefore, as Burzynski's treatment with antineoplastons violated federal and state law and was not covered under the terms of the policy, Provident has no duty to compensate him for the treatment rendered to McKeeby. Hence, Burzynski's counterclaim must fail.

III.    Conclusion

193.    Provident has failed to show that Burzynski committed fraud or engaged in actionable negligent misrepresentation with respect to Medow, McKeeby, or Hadley, due to a lack of justifiable reliance on the part of Provident. It has, however, shown that Burzynski was unjustly enriched by the payments made to him for the treatment of these patients. Accordingly, Provident is entitled to restitution for its payments made to Burzynski on behalf Medow, McKeeby, and Hadley.

194.    As to Gallagher, Harvey, and Carroll, ERISA preempts Provident's state law claims against Burzynski. Provident, however, is entitled to recover under ERISA's civil enforcement provision all payments made to Burzynski on behalf of these patients.

195.    Provident also is entitled to recover prejudgment and postjudgment interest on all of its claims. It is not, however, entitled to an award of punitive damages. Provident may recover attorneys' fees and costs for its prosecution of the ERISA claims, but attorneys' fees are not recoverable for the state law claims. Furthermore, as BRI is not the alter ego of Burzynski, Provident cannot recover from it except for the monies paid to BRI directly.

196.  A declaration that Provident has no obligation to pay Burzynski for the treatment of Gallagher or McKeeby is warranted.  Accordingly, Burzynski is not entitled to recover on his counterclaim for McKeeby's treatment.

197.  On or before August 24, 1998, Provident shall file an affidavit and supporting documentation itemizing the attorneys' fees incurred in pursuing its claim for recovery of the amounts paid to Burzynski on behalf of Gallagher, Carroll, and Harvey.

IT IS SO ORDERED.

SIGNED at Houston, Texas, on this the _7th_ day of _August_ , 1998.

Marcia A. Crone
United States Magistrate Judge